# United States Court of Appeals
## For the First Circuit

No. 07-1044

UNITED STATES OF AMERICA
Appellee,

v.

ELBA GARCÍA-PASTRANA,
Defendant, Appellant.

No. 07-1094

UNITED STATES OF AMERICA,
Appellee,

v.

HÉCTOR RENÉ LUGO-RÍOS,
Defendant, Appellant.

No. 07-1095

UNITED STATES OF AMERICA,
Appellee,

v.

JUAN RAMOS-HERNÁNDEZ,
Defendant, Appellant.

No. 07-1096

UNITED STATES OF AMERICA,
Appellee,

v.

FELIPE ROMÁN-LOZADA,
Defendant, Appellant.

No. 07-1097

UNITED STATES OF AMERICA,
Appellee,

v.

JUAN ROLDÁN-VEGA,
Defendant, Appellant.

_____

No. 07-1098

UNITED STATES OF AMERICA,
Appellee,

v.

ANDRÉS CARRASQUILLO-COLÓN,
Defendant, Appellant.

_____

No. 07-1177

UNITED STATES OF AMERICA,
Appellee,

v.

ENRIQUE VÁZQUEZ-PRÉSTAMO,
Defendant, Appellant.

_____

No. 07-1232

UNITED STATES OF AMERICA,
Appellee,

v.

FRANCISCO MARTÍNEZ-IRIZARRY,
Defendant, Appellant.

_____

No. 07-1501

UNITED STATES OF AMERICA,
Appellee,

v.

JORGE L. URBINA-ACEVEDO,
Defendant, Appellant.

No. 07-1557

UNITED STATES OF AMERICA,
Appellee,

v.

JESÚS CARABALLO-ORTIZ,
Defendant, Appellant.

No. 07-1558

UNITED STATES OF AMERICA,
Appellee,

v.

LUIS ANDINO-DELBREY,
Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. José A. Fusté, U.S. District Judge]

Before

Torruella, Circuit Judge,
Leval,[*] Senior Circuit Judge,
and Lipez, Circuit Judge.

Linda Backiel, with whom José R. Aguayo Caussade and Víctor P. Miranda Corrada, were on joint brief for appellants Ramos, Román, and Roldán.
Rafael F. Castro-Lanq, was on brief for appellants García and Vázquez.
Anita Hill-Adames, for appellant Lugo.
Laura Maldonado-Rodríguez, with whom Lydia Lizarribar and Francisco Dolz-Sánchez, were on joint brief for appellants Urbina, Caraballo, and Andino.
Lydia Lizarribar, with whom Laura Maldonado-Rodríguez and

_____

[*] Of the Second Circuit, sitting by designation.

- 3 -

Francisco Dolz-Sánchez, were on joint brief for appellants Urbina, Caraballo, and Andino.

Carlos E. Montañez, for appellant Carrasquillo.

Miguel E. Miranda-Gutiérrez, for appellant Martínez.

Joseph F. Palmer, with whom Stephan E. Oestreicher, Jr., Attorney, Appellate Section, Criminal Division, U.S. Department of Justice, Rosa E. Rodríguez-Vélez, United States Attorney, District of Puerto Rico, and José A. Ruiz-Santiago, Assistant United States Attorney, District of Puerto Rico, were on brief for appellee.

_____

October 20, 2009

_____

**TORRUELLA**, **Circuit Judge**. This consolidated appeal concerns a scheme to embezzle and launder funds for a union health plan. The eleven defendants-appellants were employees of the Puerto Rico Aqueducts and Sewer Authority (the Autoridad de Acueductos y Alcantarillados de Puerto Rico, hereinafter the "AAA") and officials of the Unión Independiente Auténtica de Empleados de la AAA (hereinafter the "Union"). Each defendant was convicted after a jury trial of embezzling and laundering funds designated for a health plan administered by the Union. The appeal raises numerous issues concerning the sufficiency of the evidence, the jury instructions, trial procedure, and sentencing. After careful consideration, we affirm in part, reverse in part, and remand for further proceedings.

I. Background. . . . . . . . . . . . . . . . . . . . . . . . . . -7-

A.        Dramatis Personae.. . . . . . . . . . . . . . . . . . -7-

B._____1998 to 2001 Conduct. . . . . . . . . . . . . . . . -12-

C.        2002 to 2003 Conduct. . . . . . . . . . . . . . . . -18-

D.        2004 to 2006 Conduct. . . . . . . . . . . . . . . . -23-

E.        The Proceedings.. . . . . . . . . . . . . . . . . . -26-

II. Discussion.. . . . . . . . . . . . . . . . . . . . . . . . -28-

A.        Sufficiency of Evidence.. . . . . . . . . . . . . . -28-

        1.      The Embezzlement Convictions.. . . . . . . -29-

                a.___"funds . . . of a health care benefit
                    program". . . . . . . . . . . . . . . . -30-

-5-

        b.    "without authority".. . . . . . . . . .  -47-

        c.    "knowingly and willfully".. . . . . .  -51-

    2.    The Money Laundering Convictions.. . . . . .  -57-

B.    Jury Instructions.. . . . . . . . . . . . . .  -61-

    1.    Embezzlement Instruction.. . . . . . . . .  -63-

        a.    instruction that AAA's contributions
              belonged to Health Plan.. . . . . . .  -63-

        b.    commingling instruction.. . . . . . .  -65-

        c.    "legal principles" instruction. . . .  -67-

    2.    Money Laundering Instruction.. . . . . . .  -71-

    3.    Good Faith Instruction.. . . . . . . . . .  -73-

    4.    Rejection of Tax Evasion Instruction.. . .  -74-

C.    Trial Procedure.. . . . . . . . . . . . . . .  -76-

    1.    Mid-Trial Severance Challenge. . . . . . .  -76-

    2.    Misstatement in Closing Argument.. . . . .  -78-

    3.    Post-Trial Threats and Harassment. . . . .  -81-

D.    Sentencing. . . . . . . . . . . . . . . . . .  -83-

    1.    Loss Calculation Enhancement.. . . . . . .  -83-

    2.    Lugo Enhancements. . . . . . . . . . . . .  -86-

        a.    sophisticated means.. . . . . . . . .  -87-

        b.    $1,000,000 in gross receipts from a
              "financial institution[]".. . . . . .  -87-

        c.    "organizer or leader".. . . . . . . .  -88-

    3.    Substantive Reasonableness.. . . . . . . .  -89-

III.  Conclusion . . . . . . . . . . . . . . . . . . . .  -90-

# I. Background

The following facts are based on the evidence presented at trial.

## A. Dramatis Personae

There are eleven appellant-defendants in this consolidated appeal (together, the "Defendants"). They are:

(1) Héctor René Lugo-Ríos ("Lugo")

(2) Andrés Carrasquillo-Colón ("Carrasquillo")

(3) Elba García-Pastrana ("García")

(4) Felipe Román-Lozada ("Román")

(5) Jesús Caraballo-Ortiz ("Caraballo")

(6) Luis Andino-Delbrey ("Andino")

(7) Francisco Martínez-Irizarry ("Martínez")

(8) Juan Ramos-Hernández ("Ramos")

(9) Enrique Vázquez-Préstamo ("Vázquez")

(10) Jorge L. Urbina-Acevedo ("Urbina")

(11) Juan Roldán-Vega ("Roldán")

The Defendants were non-management, "regular" employees of AAA, a public utility company providing water and sewer services to Puerto Rico's residents. Each defendant was also a member of the Union, which represented AAA's non-management employees. Management employees of AAA were members of a different union, called Hermandad Independiente Empleados Profesionales de la AAA ("HIEPPA").

-7-

At all times relevant to this appeal, the Union had approximately 4,500 total members, and each member paid $7 per month in membership dues. The Union had other funds. Apart from the health plan contributions at issue in this appeal, the Union also received (1) monthly contributions to "a temporary disability insurance" program known as the "SINOT and Uniform Benefits program" (hereinafter "SINOT");[1] (2) monthly contributions to an employee savings and retirement program; and (3) money received by the Union for renting out a parking lot.

The Union's composition, activities, and finances were governed by two documents: (1) a constitution and (2) a collective bargaining agreement with the AAA.[2] The Union's constitution established a Central Executive Committee ("CEC") responsible for the Union's finances and day-to-day administration. The CEC consisted of a president, vice president, executive secretary, and treasurer, as well as a single representative from each of the Union's seven local chapters. At all times relevant to this appeal, Lugo, Carrasquillo, García, and Román served as the president, vice president, executive secretary, and treasurer,

---

[1] At trial, José Nieves, AAA's Labor Relations manager labor, testified that SINOT was a Spanish acronym for "temporary disability insurance, occupational insurance."

[2] The collective bargaining agreement relevant to this appeal was in effect from 1998 until 2003. Afterwards, and as discussed below, the Union went on strike after negotiations broke down on a new collective bargaining agreement.

respectively, of the CEC (together, the "Top Four Defendants"). At all times relevant to this appeal, Caraballo, Andino, Martínez, Ramos, Vázquez, Urbina, and Roldán were presidents of the Union's seven local chapters (together, the "Chapter Presidents").

The Union did not provide a salary for CEC officers. Instead, the officers were paid under a labor leave with pay provision in the collective bargaining agreement. Under that "labor leave" provision, also referred to as a "labor license," the AAA paid the officers their full salaries, but excused the officers from their AAA jobs to work full time for the Union.[3]

Under the collective-bargaining agreement, the AAA agreed to contribute a fixed amount per month to a "health insurance plan" for every Union member.[4] At all times relevant to this appeal, the monthly contributions ranged from $232 to $355 per member.

---

[3] The provision states:

> The [AAA] shall grant the Union full leave with pay to the members of the executive central committee of the Union . . . . The Union shall reimburse said salaries including fringe benefits.

[4] The provision states:

> The [AAA] agrees to contribute to the health insurance plan the following amounts for each Union member employee so that the employee, his spouse and dependent children under the age of 19 or, if they continue on as full-time students, up to the age of 23, may enjoy the following services: A) A family health insurance plan that includes hospitalization, surgery, and dispensary services B) a medicine payment plan, C) a dental plan, D) major medical, and E) eyeglasses.

Until 1993, the Union used the AAA's contributions to administer a health plan called Plan de Salud UIA (the "Old Health Plan"). The Old Health Plan was not incorporated as a "health service organization" and thus was not subject to the jurisdiction of Puerto Rico's Office of the Insurance Commissioner (the "OIC").

In late 1993, the CEC incorporated the Union-operated plan as a health service organization, Plan de Salud UIA (the "Health Plan" or "Plan"). Defendants Lugo, Carrasquillo, García, and Román filed paperwork certifying that the Union would administer the AAA's medical contributions "in compliance with" and otherwise be subject to "the Puerto Rico Insurance Code." In incorporating the Health Plan, the Union complied with provisions of the collective bargaining agreement that required that "[t]he Union . . . contract the services of a medical plan that is authorized by the [OIC]" and that "the medical plan fully compl[y] with all the requirements imposed by the [OIC]."[5]

The Health Plan's bylaws provided that the Health Plan was a "non-profit corporation with the fundamental purpose of providing health care services to the employees of [the AAA] who are members of the [Union]." They further stated that "[t]he principal source of financing of [the Health Plan] shall be the contributions negotiated by means of the Collective Bargaining

---

[5] These provisions were in the collective bargaining agreement in effect at the time of the incorporation, and were carried over into the collective bargaining agreement at issue in this appeal.

-10-

Agreement, to be made by the [AAA]."  Under the collective bargaining agreement, the AAA would disburse each monthly Health Plan contribution to the Union via a check in the Union's name.[6] Although the funds were not directly sent to the Health Plan, the AAA's monthly checks stated on their face that they were "health plan contribution[s],"[7] and the collective bargaining agreement further provided that AAA "agree[d] to contribute to the medical plan the following amounts for each employee."  (Emphasis added). In addition, the collective bargaining agreement did not specifically provide that the funds belonged to the Union or that the Union could keep any surplus should it contract with a medical plan for less than the AAA contribution amount.

The Health Plan's bylaws further established a board of directors consisting of eleven members, four of whom would serve on an Executive Committee composed of a president, vice president, executive secretary, and treasurer, with nearly identical duties to their Union counterparts.  Like the Union's constitution, the

---

[6]  Specifically, the bylaws provided that "[t]he [AAA] shall send directly to the [Union] on or before the fifth (5th) day of each month the amount corresponding to the number of Union employees covered monthly by the plan as of the last day of the preceding month."  In addition, José Nieves, the AAA's Labor Relations manager, testified that the collective bargaining agreement "established that [the payments] would be paid to Héctor René Lugo and [the Union]," but that the checks were "identified for health plan."

[7]  The checks stated, below the name of the Union as payee, "Aportación Plan Médico," which was translated at trial as "health plan contribution."

Plan's bylaws did not provide the board members with a salary. As provided by the Puerto Rico Insurance Code, the Plan's board of directors would be "fiduciarily responsible" for funds received on behalf of the Plan's subscribers.[8]

In 1995, after the Health Plan was incorporated, the eleven defendants and four other individuals met at Union headquarters to elect a board for the Health Plan. Lugo, Carrasquillo, García, and Román were chosen for the Executive Committee; they would serve as president, vice president, executive secretary, and treasurer, respectively. The other seven defendants were chosen for the other seven slots; they would serve as Health Plan "delegates" for their respective Union chapters. Thus, at the times relevant to this case, all eleven defendants simultaneously served as members of the Union's CEC and as members of the Health Plan's board.

## B. 1998 to 2001 Conduct

The Top Four Defendants controlled two Union bank accounts of significance to this appeal: (1) the Infrastructure Account and (2) the Union Account. The Top Four Defendants, in

---

[8] At trial the statute was translated as "fiduciarily responsible," although the official translation of the statute translates the words as "fiducially liable." See P.R. Laws Ann. tit. 26, § 1907 ("Fiduciary liability[:] Any director, officer or member of a health service[ ] organization who receives, collects, disburses or invests funds related to the activities of said organization, shall be fiducially liable for the funds received from the subscribers.").

their capacity as the Plan's executive committee, also controlled the Health Plan's bank account (the "Plan Account"), which belonged directly to the Health Plan.

From 1998 through most of 2001, the evidence showed that, upon receipt of the monthly "medical plan contributions" from the AAA, Lugo and Román would generally engage in the following transactions:

1.  Lugo and Román would first deposit all of the AAA's Health Plan contributions directly into the Plan Account.

2.  After the first transfer was complete, Lugo and Román would then transfer some of that money from the Plan Account into the Infrastructure Account.

3.  They would then transfer some of the money from the Infrastructure Account to the Union Account, which is where the Union's membership dues were deposited.

4.  Finally, they would pay themselves and the other Defendants from both the Infrastructure and Union Accounts, via regular checks subsequently cashed or deposited into each of the Defendant's personal bank accounts.

In 2000, the OIC, using its broad investigatory authority,[9] audited the Health Plan. During the audit of the

---

[9]  See P.R. Laws Ann. tit. 26, § 1903a(2) ("The Commissioner may examine and investigate [those organizations subject to its jurisdiction] with the purpose of determining their organization and solvency, as well as their compliance with the provisions of this Code."); id. § 1918 (setting forth required examinations of organizations subject to the OIC's oversight).

transfers from the Plan Account to the Infrastructure Account, the OIC discovered that the transfers amounted to six percent of the AAA's monthly contributions, and that the Union was charging the Plan that amount for "administrative services." Because there was no contract or other documentation to support the six-percent payments, the OIC concluded that the Health Plan had violated the Insurance Code, which required a health service organization to file a formal request before delegating administrative functions to another entity.[10] Moreover, the OIC requested additional information concerning the breakdown of the "administrative services" charged to the Health Plan. Lugo responded in an August 2001 letter that the charge covered such things as "computer systems," "equipment," "building," and "human resources" needed to administer and operate the Health Plan. The OIC kept its investigation open.

During this time, the Health Plan had negative cash flow, such that, by the latter part of 2001, the Health Plan could not cover its expenses. Under the collective bargaining agreement, the AAA agreed to assist the Plan in resolving any "deficit" in its finances, subject to an audit, so long as it was not caused by "illegal appropriation, malfeasance, misuse of funds or

---

[10] See P.R. Laws Ann. tit. 26, § 1905(2)(a) ("A health services organization, before exercising . . . the power to contract administrative functions . . . shall furnish to the Commissioner the adequate information to justify the exercise of said powers.").

-14-

negligence."[11]  Upon learning of the Health Plan debt, AAA reviewed records provided by the Health Plan to confirm the impairment, but did not conduct a full third party audit.  The records submitted for review did not reflect the payments made to the Defendants, because those payments were made from the Infrastructure and Union Accounts using money transferred out of the Plan Account.  Finding no problems in the Health Plan books provided by the Defendants, on September 9, 2001, the AAA provided the Health Plan a check for $2,781,146 payable to the Union.  The Defendants deposited the money in the Union Account.  In the weeks that followed, the Defendants wrote four separate checks from the Union Account to the Health Plan.  The checks totaled around $2.5M, less than the approximately $2.7M paid by the AAA to the Union to cover the

---

[11]  The collective bargaining agreement provides:

The stipulation between [the Union] and the AAA dated October 1, 1991 (requiring that in the event of an operational deficit in the plan due to causes not attributable to illegal appropriation, malfeasance, misuse of funds or negligence of the plan manager), the parties shall meet to analyze and resolve the deficits (shall continue in effect with that review, except for the change of the fiscal year to natural year as required by [the Union]).

Health Plan's impairment.[12]   The difference remained in the Union Account.

Throughout the 1998 to 2001 period, the AAA's monthly medical contributions were $232 per Union member.   With few exceptions, the Defendants deposited the full $232 into the Health Plan's account prior to reallocating the money into other accounts.[13]

Also during this time, the Defendants personally received a substantial portion of the funds contained in the Infrastructure and Union Accounts as compared to the Union's total income.

---

[12]   The checks were:

    1.    September 14, 2001   -    $496,157.05
    2.    September 26, 2001   -    $555,535.65
    3.    October 2, 2001      -    $261,000.00
    4.    October 3, 2001      - $1,142,199.25

The checks totaled $2,454,891.95.

[13]   Late in 2001, however, the Defendants directly deposited more than $3M of the contributions into the Union Account without first depositing the funds into the Plan Account.

At the same time, the Defendants began making frequent transfers from the Union Account to the so-called Cultural Trips Account, which also belonged to the Union.   For the next several years, García would receive regular payments from the Cultural Trips Account.   All told, she received $209,379 from the account during the period when it contained diverted Health Plan funds.   Like the payments she received from the Infrastructure and Union Accounts, she did not report any of the Cultural Trips payments in her tax returns.

| Year | Total Payments to Defendants from Union Account | Total Payments to Defendants from Infrastructure Account | Combined Total Paid to Defendants from Both Accounts | Total Income as Reported on Union Balance Sheet (not including Health Plan contributions)[14] |
|---|---|---|---|---|
| 1998 | $319,742 | $346,345 | $666,087 | $746,804 |
| 1999 | $405,256 | $352,285 | $757,541 | $690,357 |
| 2000 | $348,910 | $402,784 | $751,694 | $835,469 |

In total, from 1998 through 2001 the Defendants received $3 million from the Infrastructure and Union Accounts, with an average of about $70,000 per Defendant per year. The amounts dwarf the amount reported by the Defendants on their annual income tax statement for those years, ranging from $25,609 (Urbina, 1999) to $46,048 (García, 2001). Moreover, despite receiving these payments, the Defendants were not listed on the Health Plan's payroll or the Plan's tax returns.

Throughout this time period, García, in her role as executive secretary, certified to the OIC that all of the members of the Health Plan's board, which consisted of the eleven Defendants, fully discussed the full gamut of the Plan's business on a frequent basis.[15]

_____

[14] As discussed in more detail below, the balance sheets did not reflect all funds available to the Union, such as the SINOT contributions, but it did comprise the income the Union reported that it received.

[15] The 1999 certification, for example, states:

I certify that the Board of Directors of the UIA's Health

## C. 2002 to 2003 Conduct

The landscape altered dramatically in the beginning of 2002.

In early 2002, the OIC continued its investigation into the "administrative services" the Defendants charged the Health Plan. In January 2002, Lugo sent the OIC a letter attaching what he claimed was the "contract" under which the Defendants provided such administrative services for the Health Plan. The contract had only been signed a week earlier by Lugo and José Sánchez Gastaltierri ("Sánchez"), the Health Plan's administrator. Sánchez would later testify at trial that García had given him the contract to sign, and he had signed it that same day or the day afterward without analyzing it. He further testified that he only signed it because he "understood that to be a requirement" of his job as a "consultant" to Lugo and the Health Plan.

Still in early 2002, a "me-too" clause in the collective bargaining agreement required AAA to contribute the same amount of funds for health care for Union members as for members of HIEPPA. Accordingly, beginning in February 2002, the AAA began to contribute $355 monthly to the Health Plan for each Union member.

---

Plan, Inc., has not officially met during the last two years. However, all of its members discuss and analyze the diversity of administrative issues of their incumbency on a daily basis. The reason for this being that the premiums of the UIA Health Plan, Inc. are paid entirely by the employer ([AAA]) and are subject to the negotiation of the Collective Bargaining Agreement.

Also beginning in February 2002, the Defendants opened a new banking account, known as the Welfare Account, which did not appear in either the Union's or the Health Plan's records.[16] The opening of the Welfare Account came hot on the heels of a Report of Examination issued by the OIC on December 17, 2001, which found that the Health Plan violated the Insurance Code[17] by charging the AAA a higher rate than was approved by the OIC.[18] In fact, the Health Plan had not sought approval for its rate since 1994, when the OIC approved a rate of $222 per subscriber.

Thus, purportedly to avoid any fines for charging unapproved rates,[19] the Defendants went against their prior practice and began to deposit the full $355 per member contribution into the Welfare Account, and later would transfer a substantial portion of the contribution into the Health Plan. The remaining amount would

---

[16] In fact, Rubén Luciano Guzmán ("Luciano"), the Health Plan's accountant, testified at trial that the Welfare Account effectively belonged to the Union because he never had access to it.

[17] See P.R. Laws Ann. tit. 26, § 1908(2)(a) ("Every health services organization shall register the rates to be used in any health care plan with the Commissioner before applying them in Puerto Rico.").

[18] After challenging the finding, the Defendants would later be fined for the violation in August 2003.

[19] Luciano would testify at trial that Carrasquillo told him that he opened the Welfare Account because the OIC had fined them for sending the Plan a "surplus" above $222 and that he wanted "to avoid further fines." Luciano further testified that he did not believe Carrasquillo because, to avoid fines, the Defendants either would have discontinued using unapproved rates or would have asked for a rate increase.

be transferred through different Union-controlled accounts to pay the Defendants and to finance Union activities. In 2002, the AAA's $355 monthly contributions per member totaled more than $20.3 million. However, only $16.3 million of that amount ultimately reached the Health Plan.

The Health Plan subsequently faced another impairment. This time, the Defendants decided that, to cover the debt, the Health Plan would seek a series of loans from the Union, which would require the Plan to obtain OIC approval of the loans. The Plan sent the OIC the requisite paperwork, which was certified by García and Román. Luciano testified that, at the time the loans were made, he "did not believe that the [U]nion had that kind of money to lend . . . out," given how minimal its income was in comparison with the Plan's. He further testified that when he aired his concerns, he was later fired, he believed in part because of these "differences." The OIC ultimately approved the loans based on the Defendants' representations.

The Union made four loans to the Health Plan in 2002 and 2003, totaling about $3.9 million. The Defendants disbursed each of the four loan checks from the Union Account into the Plan Account. However, shortly after writing each loan check the Defendants would write another check in the same amount from the Welfare Account to the Union Account, sometimes on the same day (as shown below):

-20-

```
4/16/02    Union Account    ➜ Health Plan    $600,057
4/30/02    Welfare Account  ➜ Union Account  $600,057

4/9/03     Union Account    ➜ Health Plan    $1,790,000
4/9/03     Welfare Account  ➜ Union Account  $1,790,000

8/21/03    Union Account    ➜ Health Plan    $183,245
8/21/03    Welfare Account  ➜ Union Account  $183,245

9/11/03    Union Account    ➜ Health Plan    $1,391,630
9/11/03    Welfare Account  ➜ Union Account  $1,391,630
```

Because the Welfare Account was funded with money intended for the Health Plan, essentially the Union was loaning the Health Plan its own funds. The OIC would later discover that the Health Plan was loaning itself its own money and order the loans annulled.

In 2003, the Defendants opened yet another Union bank account, the Administration Account. They deposited into that account the remaining funds from the Old Health Plan, funds that had never been transferred to the new Plan when it was first incorporated. As with the Infrastructure and Union Accounts, the Defendants also diverted funds to themselves from the Administration Account.

Throughout the course of 2002 and 2003, the Defendants, particularly Lugo, Carasquillo, and García, remained in contact with the OIC concerning the purported administrative services contract. Aurea López, the OIC's chief investigator, testified at length concerning irregularities in the contract, including but not limited to: (1) the Health Plan, rather than seek approval from the

OIC before delegating functions to the Union, submitted an already-executed contract; (2) the contract lacked any specificity; (3) the Defendants' responses to OIC questions concerning what the contract covered were vague; (3) Lugo's attempt to clarify the contract in one instance actually added terms (such as property damage insurance) that were not in the contract; (4) the Union was overcharging the Plan, paying more than $2.2 million more than fair market value for the services the Union provided; (5) neither the Union nor the Plan passed a corporate resolution authorizing the contract; and (6) the contract stated that Sánchez had "complete authority" to sign it on the Plan's behalf, when there was no evidence that he had such authority.

From 2002 through 2003, the Defendants paid themselves a total of more than $1,700,000 from the Infrastructure, Union, and Administration Accounts. Again, none of the Defendants reported this income in their tax returns, despite the fact that the income overwhelmed the amount of money they actually reported. Moreover, the Health Plan's tax returns, which again Lugo signed, did not list the Defendants on the payroll. Finally, from 2002 through 2003, the Defendants were purportedly meeting regularly "every day," eating lunch together in the Union's cafeteria (and charging the meals to the Infrastructure Account to boot).

## D.  2004 to 2006 Conduct

In January 2004, the OIC formally rejected the purported administrative services contract that had been submitted by the Union, concluding that it "substantially affect[ed] the financial situation" of the Health Plan.  The OIC cited contractual irregularities and lack of control it allowed the Health Plan over its own finances as reasons for disallowing the arrangement.  The OIC also requested information from Carrasquillo about the Infrastructure and Union Accounts, such as who was paid from them, how much, and for what services.  Carrasquillo was less than forthcoming.  He responded that the Defendants were paid from the Infrastructure Account for spending "50 to 60 percent of the[ir] time" on Health Plan matters, and that he could provide further details but the books were behind.  As for the Union Account, Carrasquillo stated that any inquiry into it was "not appropriate" and "unrelated" to the Health Plan.  Despite the OIC's rejection of the contract, the Defendants continued to transfer the Plan's funds as though the contract was still in effect.[20]

In May 2004, the OIC made public much of what it had learned about the Health Plan during its investigation.  The Defendants were subsequently ordered to transfer the $7.4M that

---

[20]  In April 2004, Román retired as Union treasurer and was replaced by Víctor Cornier ("Cornier").  Román proceeded to receive $30,000 from the Infrastructure, Union, and Administrative Accounts as an "[e]xtraordinary bonus for [his] years of service," although the maximum bonus authorized by the constitution was $1,000.

remained in the Welfare Account to the Health Plan.  After learning of the OIC's findings, the AAA stopped making monthly contributions to the Union for Health Plan purposes, and instead began to deposit contribution payments directly into the Plan Account.  In August 2004, the AAA stopped contributing to the Health Plan entirely.  It also ceased paying the Defendants under the labor leave provisions of the collective bargaining agreement.

Shortly thereafter, in September 2004, all eleven Defendants filed amended tax returns for every year from 1998 through 2003, reporting purported "income" that they had not reported earlier.  In a creative stroke, the Defendants listed the previously unreported income as "payments received for professions and commissions" without listing what those "professions" or "commissions" were.

In October 2004, the Union began a twelve week strike. While on strike, the Union members, including the Defendants, were not entitled to any salary or benefits from the AAA.  Instead, the Union itself would pay each member $300 every two weeks for participating in strike activities, for a maximum of up to $1,800. During the strike, however, all of the Defendants received payments from the Infrastructure and Union Accounts.  Many of these payments were treated as reimbursement expenses although the Defendants had no supporting documentation.

-24-

Including these final payments during the strike, the Defendants received a total of more than $5.8M from the Infrastructure, Union, and Administration Accounts from 1998 through 2004.  The individual Defendants' totals were as follows:

Lugo                        $1,757,164
Carrasquillo                $948,166
García                      $540,127[21]
Román                       $868,421
Caraballo                   $287,204
Andino                      $282,086
Martínez                    $247,897
Ramos                       $234,714
Vázquez                     $247,075
Urbina                      $194,729
Roldán                      $203,827

In late October 2004, federal agents executed a search warrant at the Union's headquarters, which also housed the Health Plan's offices.  Agents seized from Lugo's office nearly $40,000 in cash, along with ten uncashed checks from the Infrastructure Account and incomplete Health Plan board meeting minutes.

In 2005, a grand jury issued a subpoena to the Health Plan's custodian of records, seeking the complete minute book for the Plan's board meetings.  García, the Health Plan's custodian, declined to produce the book, claiming that it was seized during the search.  In early 2006, just months before trial, García gave the minute book to her successor as the Health Plan's executive secretary, Enrique Dávila Vargas ("Dávila"), which later was

---

[21]  This excluded the amounts that García had received from the Cultural Trips Account.

obtained by the government during trial. The book contained additional meeting minutes that were not included in the documents seized by the government.

## E. The Proceedings

The Defendants were charged in a 140-count indictment.[22] Count 1 charged all Defendants with a conspiracy to violate 18 U.S.C. § 669, which prohibits the embezzlement or misapplication of funds of a "health care benefit program." Counts 2 through 132 each charged an individual Defendant with receipt of a check from a Union bank account (e.g., the Infrastructure Account, the Union Account) that the government alleged constituted substantive embezzlement of Health Plan funds in violation of § 669.[23] Counts 133-39 charged Román and Lugo jointly with misapplication of funds

---

[22] The indictment also contained two forfeiture counts, Counts 141-42, that were later dismissed by the district court and are not at issue on appeal.

[23] For example, Counts 2-13 charged Lugo with embezzlement of "assets of the [Health Plan], a health care benefit program, as defined in Title 18, United States Code, Section 24," and listed twelve checks, including dates, check numbers, amounts, and the account the check came from (Infrastructure, Union, or Administration). The Counts were allocated as follows:

```
Carrasquillo    Counts 14-25
García          Counts 26-36
Román           Counts 37-48
Caraballo       Counts 49-60
Andino          Counts 61-72
Martínez        Counts 73-84
Ramos           Counts 85-96
Vázquez         Counts 97-108
Urbina          Counts 109-120
Roldán          Counts 121-132
```

in violation 18 U.S.C. § 669, specifically funds concerning the Old Health Plan.[24]  Finally, Count 140 charged all of the Defendants with a conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(a)(1)(A)(i), § 1956(a)(1)(B)(i), & § 1956(h).

The case proceeded to trial, which commenced on May 2, 2006.  At trial, a number of witnesses testified for the government: Nieves; López; Luciano; Sánchez; Cornier; Dávila; Jennifer Griffen, an FBI financial analyst who was involved in the October 2004 search and who testified to the payments to the Defendants from the Union, Infrastructure, and Administrative Accounts; Clotilde Díaz ("Díaz"), who ran the Union cafeteria; and Gerald LaPorte, an expert on ink analysis of documents.  The Defendants countered with, among other things, the testimony of Lemuel Toledo ("Toledo"), a certified insurance counselor who testified as to the reasonableness of the rate charged under the administrative services contract and Manuel Villalón, a tax attorney and CPA who advised the Defendants.

Of significance to this appeal, the government gave the minute book it obtained from Dávila to LaPorte to be examined.  At trial, LaPorte testified that the minutes dating from 1995-2003, including all meetings relating to the Health Plan loans, were

---

[24]  Of particular note, Counts 137 and 138 charged Lugo and Román with misapplying funds from the Old Health Plan (specifically, checks of $1,000 and $43,063) to purchase a "2003 Jaguar X-Type . . . for the personal use of defendant Lugo."

likely not authored on the dates presented.  In fact, he testified that the evidence "strongly support[ed]" the conclusion that the minutes in question, including the loan minutes, were all created at the same time, rather than over the course of eight years.

In June 2006, following a seven-week jury trial, all of the Defendants except Carrasquillo were convicted of all charges they faced.  In September 2006, following a separate three-week jury trial, Carrasquillo, who was tried separately due to illness, was likewise convicted of all charges that pertained to him.  In December 2006 and February 2007, the Defendants were sentenced, with the respective sentences ranging from twelve months and a day (Caraballo, Andino, and Urbina) to 210 months (Lugo).

The Defendants now appeal.

## II.  Discussion

### A.  Sufficiency of Evidence

The Defendants raise a number of issues concerning the sufficiency of the evidence in support of their convictions.  "We review a sufficiency claim de novo, drawing all reasonable inferences in favor of the verdict to determine whether a rational jury could find each element of the crime beyond a reasonable doubt."  United States v. Scott, 564 F.3d 34, 39 (1st Cir. 2009) (citing United States v. DeCologero, 530 F.3d 36, 65 (1st Cir. 2008)).  In reviewing the sufficiency of the evidence, "[w]e do not 'weigh evidence or make credibility judgments.'"  United States v.

<u>Bristol-Mártir</u>, 570 F.3d 29, 38 (1st Cir. 2009) (quoting <u>United States</u> v. <u>Ofray-Campos</u>, 534 F.3d 1, 31 (1st Cir. 2008)). Moreover, we "'must uphold any verdict that is supported by a plausible rendition of the record.'" <u>Id.</u> at 38 (quoting <u>Ofray-Campos</u>, 534 F.3d at 32).

### 1.  **The Embezzlement Convictions**

The Defendants contend that the evidence is insufficient to support their convictions for embezzlement. Each was convicted under Count I of conspiring to embezzle Health Plan funds pursuant to 18 U.S.C. § 669 and 18 U.S.C. § 371. The Defendants were also convicted of separate counts of substantive embezzlement under § 669 based on payments they received from either the Union, Infrastructure, or Administrative Accounts.

18 U.S.C. § 669, the basis of the embezzlement convictions, provides:

> Whoever knowingly and willfully embezzles, steals, or otherwise without authority converts to the use of any person other than the rightful owner, or intentionally misapplies any of the moneys, funds, securities, premiums, credits, property, or other assets of a health care benefit program, shall be fined . . . or imprisoned . . . or both . . . .

18 U.S.C. § 669(a).  Section 669 "remains largely untested and unanalyzed."  Robert Fabrikant et al., Health Care Fraud § 2.02[5], at 2-34 (2009).[25]

### a.  "funds . . . of a health care benefit program"

The Defendants first contend that there is insufficient evidence to establish that the transactions at issue in support of Counts 2 through 139 involved "funds . . . of a health care benefit program."[26]  18 U.S.C. § 669.  They argue that, because the Defendants commingled Health Plan funds with other funds within the custody of the Union, there is insufficient evidence to establish that the Defendants embezzled Health Plan funds as opposed to other Union funds.

A first reason for rejecting this contention is that the defendants effectively admitted in their testimony and their arguments to the jury that the moneys they took were essentially payments to them by the Health Plan for services they rendered to

---

[25]  Lugo separately argues that 18 U.S.C. § 669 is "void for vagueness" since it "d[oes] not make . . . reasonably clear that the compensation [he] received" was prohibited.  Lugo claims that the Union's constitution, its collective bargaining agreement, and the Plan's bylaws all failed to give him "fair warning" that he could not take the payments that he did.  His claim, however, is better understood as a sufficiency claim as to whether his conduct was "knowing and willing."  We discuss that sufficiency claim in more detail below.

[26]  The Defendants, in supplemental briefing, concede that their argument as to the character of the funds does not apply to Count 1, the conspiracy to embezzle count, and Count 140, the money laundering count.

it. It was the Defendants' position throughout trial that as officials of the Health Plan, they rendered numerous administrative and executive services to it for which they were entitled to compensation, and that moneys which are the basis of the allegations of the embezzlement were not embezzled at all but were rather taken by them as the Health Plan's proper compensation to them for the services they rendered. Their contention that there was insufficient evidence to prove that the funds were Health Plan moneys is contradicted by their own assertions that these were Health Plan moneys.

Even without these admissions, we would reject the Defendants' contention. As a threshold matter, the parties dispute what § 669 requires the government to show in order to prove that the purportedly embezzled funds were "funds . . . of a health care benefit plan."[27] The language of the statute does not provide any guidance, and the few cases that have concerned convictions under

_____

[27] The Defendants do not dispute that the Health Plan is a "health care benefit program" under § 669, which is defined broadly as:

> [A]ny public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.

18 U.S.C. § 24(b) (defining a "health care benefit program" for purposes of § 669). The definition applies with equal force to the Old Health Plan, and thus to the misapplication counts (Counts 133-39) involving those funds. Accordingly, we reject Lugo and Román's contention otherwise.

§ 669 have not addressed the government's burden in proving that embezzled funds are "funds . . . of a health care benefit program." See, e.g., United States v. Whited, 311 F.3d 259 (3d Cir. 2002) (addressing sufficiency of the indictment, meaning of "health care benefit program," and Commerce Clause challenges to § 669); United States v. Jackson, 524 F.3d 532, 534 (4th Cir. 2008), vacated on other grounds, 129 S. Ct. 1307 (2009) (mentioning, without discussing, conviction under § 669).

The Defendants point out that, in enacting § 669, Congress did not adopt the approach of other federal statutes that relieve the government of proving the character of the funds embezzled. By way of contrast, the Defendants cite 18 U.S.C. § 666, which prohibits the "embezzle[ment]" of funds "owned by, or . . . under the care, custody, or control of [an] organization, government, or agency," so long as the organization received "in any one year period, benefits in excess of $10,000 under a Federal program." 18 U.S.C. § 666(a) & (b). By its terms, § 666 does not require the government to prove that the funds purportedly embezzled are, in fact, those funds provided by the "Federal program" as opposed to other funds. In fact, the legislative history of § 666 shows that it was enacted precisely to deal with the difficulty of proving the "federal character" of funds under

the general federal fraud statute, 18 U.S.C. § 641.[28]  See S. Rep. No. 98-225, at 369 (1985), reprinted in 1984 U.S.C.C.A.N. 3182, 3510 (noting that § 641 required the government to show "that the property stolen is property of the United States," which was "impossible" in many cases where "the funds are so commingled that the federal character of the funds [could] not be shown").

By contrast, the Defendants argue that § 669 provides no such language.  In fact, in enacting § 669 as part of the Health Insurance Portability and Accountability Act of 1996, ("HIPAA"), see Pub. L. No. 104-191, 110 Stat. 1936 (1996),[29] Congress had the opportunity to adopt the approach taken by § 666 but chose not to. Instead, and as the government concedes, § 669 was most likely

_____

[28]  18 U.S.C. § 641 provides, in pertinent part:

Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another, or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof;
. . .
Shall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property in the aggregate, combining amounts from all the counts for which the defendant is convicted in a single case, does not exceed the sum of $1,000, he shall be fined under this title or imprisoned not more than one year, or both.

[29]  At least one circuit has noted that Section 669, and HIPAA generally, were "broad measures Congress enacted in its effort to 'combat waste, fraud, and abuse in health insurance and health care delivery.'"  Whited, 311 F.3d at 268 (citation omitted).

-33-

"modeled after" § 641.  See Fabrikant et al., supra, § 3.02[13], at 3-114 to 3-115 (2007) (noting that § 669 was "modeled after 18 U.S.C. Section 641, which makes it a crime to embezzle, steal, or convert property or a thing of value belonging to the United States"); see also Diana Douglas, Attorneys Caught in the Web of Medicare/Medicaid Fraud, 21 J. Legal. Med. 395, 412 (2000) ("Section 669 was patterned after 18 U.S.C. section 641, the federal theft and embezzlement statute, and serves as a companion to it.").[30]  Indeed, although not mirror images of each other, both set forth the character of the funds as an element of the offense.

We agree with the Defendants' premise that § 641 provides the closest analogue to § 669.  However, we disagree with the Defendants' conclusion that embezzled dollars cannot serve as the basis of a conviction under § 669 unless they are proven to have been the property of a health plan.

Like § 669, the case law interpreting § 641 is sparse, but courts have generally not required the government to trace the dollars embezzled to a federal source.  In United States v. Gibbs, for example, the Ninth Circuit addressed a sufficiency challenge to a § 641 conviction in the context of commingled sources of funding. 704 F.2d 464 (9th Cir. 1983) (per curiam).  There, the defendant founded a corporation to "promote educational opportunities for

_____

[30]  These secondary sources do not cite any legislative history for this proposition, nor do the parties cite any.

American Indians" that "received most of its funds from the federal government." Id. at 465. The defendant was convicted under § 641 despite the fact that the defendant "commingled federal funds with nonfederal funds received from state and private sources." Id.

The Ninth Circuit upheld the conviction, which involved multiple counts of substantive embezzlement where "the amount of nonfederal funds exceeded the amounts embezzled, [such that] it is possible that the funds embezzled were entirely nonfederal." Id. at 465-66 (noting that the defendant was charged "with thirty-four counts of embezzlement under 18 U.S.C. § 641" and that the "jury convicted him of twenty of the counts."). In doing so, the court rejected the defendant's argument that the government failed to prove "the federal nature of the funds embezzled." Id. at 465. The court held, in particular, that the evidence was sufficient because (1) "between 80-86% of the funds in the account from which [the defendant] embezzled was federal money" and (2) "the federal government monitored and controlled these funds." Id. at 466. A number of other courts have adopted the same approach. See, e.g., United States v. Evans, 572 F.2d 455, 474 (5th Cir. 1978) (holding that the evidence sufficient to support a conviction under § 641 where more than 75 percent of the funds in the commingled account were federal and were "subject to extensive federal controls"); United States v. Scott, 784 F.2d 787, 790-91 (7th Cir. 1986) (per curiam) (holding evidence was sufficient to support verdict under

§ 641 where 98% percent of the commingled funds were federal and "the federal government still maintained supervision and control over the funds at the point when the funds were stolen.").

Our case law is not to the contrary. Defendants cite United States v. Elías-Rivera, where we noted that, in the bankruptcy context, there "is an established presumption that withdrawals for other than trust purposes from an account in which trust funds are commingled with nontrust funds are presumed to be made from nontrust funds." 848 F.2d 16, 19 (1st Cir. 1998). But in that case, involving a bankruptcy trustee who commingled all of the estates he supervised in one account, "[t]he prosecution failed to prove that funds were even missing, much less missing from funds belonging to the debtors," such that there was a "total lack of evidence" to "rebut [the] presumption." Id. Elías-Rivera, therefore, does not speak to the situation here, which concerns what evidence is sufficient to rebut any such presumption.

Comparing this case to Gibbs and Evans, it is clear that the funds embezzled were "funds . . . of a health care benefit program" under § 669. As in those cases, (1) the "health care benefit program" funds were a substantial portion of the commingled funds; and (2) the "health care benefit program" exercised sufficient supervision and control over the funds to preserve their character.

As the Gibbs court emphasized, "the government's supervision and control . . . is the critical factor in determining the federal character of the funds in a commingled account." 704 F.2d at 466. We conclude that, based on the evidence in this case, the Health Plan had sufficient supervision and control over the Health Plan contributions to establish that the funds embezzled were "funds . . . of a health care benefit program."

As an initial matter, the Defendants argue that the relevant analogue to "federal supervision and control" in the § 669 context is control by the AAA. But AAA is only the contributor of the funds. Section 669 protects "funds . . . of a health care benefit plan," and thus, as in the context of § 641, the relevant entity for purposes of the "supervision and control" prong is the protected entity. Moreover, as in Gibbs and Evans, the Health Plan was both the source of the funds and the protected entity. Once the Union deposited the funds in the Plan Account, the Health Plan stood in the same position as the federal government in both providing its funds to the Union and in being the victim of the Defendants' embezzlement.

The Defendants further argue that the Health Plan did not have a sufficient stake in the funds such that the funds failed to retain their "Health Plan" character once they were diverted out of the Health Plan Account. In Evans, for example, the court noted that funds in that case "ha[d] a federal origin and a federal end,

-37-

and during their outstanding circulation they [were] subject to extensive federal controls. This [was] not the situation in which the federal monies [were] intended as an outright grant." 572 F.2d at 474 (emphasis added). In particular, the Evans court noted that the federal government (in that case the Office of Education) had a sufficient stake in the funds it provided for a federal program; "The federal interest . . . is specifically established and preserved by the provision for termination of the program on a date certain and the requirement that the proportionate share of the balance in the special fund be returned to the government." Id. at 472; see also id. at 474 ("It is statutorily contemplated that the ultimate repayment will be to the federal government.").

The Defendants specifically argue that, unlike in Evans, the AAA did not have a right to recover any excess funds. But again the correct analogue is the Health Plan, not the AAA, and the funds diverted were not meant to be, even by the Defendants' own admission, "outright grants." Rather, the Defendants contend that the funds embezzled were for administrative services rendered, and certainly the Health Plan had a sufficient stake in those funds to ensure that the Plan received fair value for those services. The Defendants further argue that the collective bargaining agreement did not bar the Union from preserving any excess funds from the Health Plan. Even if that is true (which is doubtful), there were no excess funds to claim. The Health Plan throughout the time

-38-

period of the embezzlement scheme suffered significant impairments, such that there were no excess funds that the Union could claim as its own. Thus, as in Evans, the Health Plan had a right to all funds diverted by the Defendants.

The Defendants finally argue that, unlike in Gibbs and Evans, there was no equivalent to "federal regulation" that mandated oversight. But there was. As required under Puerto Rico law, the Defendants were fiduciarily responsible to the Plan and, thus, required to maintain oversight on how the funds were used. See P.R. Laws Ann. tit. 26, § 1907 ("Fiduciary liability[:] Any director, officer or member of a health service[ ] organization who receives, collects, disburses or invests funds related to the activities of said organization, shall be fiducially liable for the funds received from the subscribers."); cf. FDIC v. Sea Pines Co., 692 F.2d 973, 977 (4th Cir. 1982) (noting that interlocking directors of two boards have a fiduciary responsibility for assets of both companies). For all of the above reasons, we conclude that the Health Plan exercised supervision and control of the funds, such that they were, in fact, Health Plan funds.

Furthermore, the Health Plan funds were a substantial portion of the commingled funds that the Defendants embezzled. As an initial matter, the Defendants argue that the Health Plan contributions made by AAA did not become "funds . . . of a health care benefit program" until they were actually deposited in the

-39-

Plan Account.  They point to a concession made by the government in its brief in United States v. Jackson, S. Ct. No. 08-263, where the government conceded that employer contributions to an ERISA plan "themselves are not assets of [a] plan until the contributions are paid to the plan."  U.S. Br. at 10 (Jan. 16, 2009); see also Jackson, 524 F.3d at 543 (holding that "unpaid employer contributions to the Company and Union Plans constituted 'assets' of the Plans under 18 U.S.C. § 664," the ERISA theft statute).

The concession, to the extent that it is relevant to this case,[31] does not assist the Defendants.  With respect to the convictions occurring from 1998 to 2001, the evidence conclusively

---

[31]  We note that Jackson differs from this case in two material respects.  First, Jackson concerned whether a bare contractual obligation that had become due could be considered an "asset" for purposes of the ERISA theft statute.  See Jackson, 524 F.3d at 544. In contrast, the funds here were not just contractual obligations, but actual checks that, on their face, were made out for the specific purpose of funding the Health Plan.  Thus, at issue here are not contractual obligations but actual property.  Second, the employer in Jackson owed no fiduciary duty to the beneficiaries of the unpaid contributions.  See id. at 545 (rejecting claim that unpaid contributions were assets of the Plan because the defendant employers "were never fiduciaries of the Plan[]").  In contrast, upon receiving the checks, the Defendants in this case had a fiduciary duty to the Health Plan insofar as they were simultaneously on the Plan's board.

We further note that the Defendants' position has absurd consequences.  Indeed, at oral argument, one judge on this panel noted that, under the Defendants' position, the Defendants could not be convicted under § 669 if they had never deposited the Health Plan contributions into the Plan Account at all, and just immediately deposited the contributions into the Defendants' personal bank accounts.  Defense counsel responded that "it does not seem that I am arguing that."

demonstrated that, save for one instance, the Union transferred the entire monthly Health Plan contributions to the Plan Account. Thus, there was no question that the funds subsequently diverted were Health Plan funds. Moreover, although, beginning in 2002, the Defendants first deposited the Health Plan in the Welfare Account, a substantial amount of the funds were then deposited into the Plan Account, such that any subsequent diversion of the funds from that Account were Health Plan funds.

Turning to the evidence, it conclusively demonstrated that the Health Plan contributions, in the language from one defendant's brief, "were the largest regular deposits by far." Based upon the balance sheets provided by the Union, for the years 1998 through 2000, the Union averaged approximately $757,543 per year in income, which translates to a monthly gross income of roughly $63,000 per month. In contrast, during that same time period, and with a contribution rate of $232 per member, the AAA contributed well over $1 million per month in Health Plan contributions during that time period. This percentage alone is well above the 75 to 80 percent threshold established in § 641 cases.[32] Holding the average income of the Union constant, the disparity between the Union's average monthly income as compared to

---

[32] In fact, as noted in the background section above, from 1998 to 2001 the total amount actually paid to the Defendants was similar in amount (or exceeded) the total amount of reported income for the Union.

-41-

the Health Plan contributions was even greater from 2002 to 2004. During this time period, the rate increased dramatically, such that the Union was receiving between $1.5 million and $2.3 million in Health Plan contributions per month from 2002 to 2004.

The Defendants counter by arguing that the balance sheets failed to include SINOT, retirement, and rental income, which were also commingled with Health Plan funds.[33] However, their resort to these additional funds is unavailing. Including these amounts, the evidence showed that the Union contributed approximately $151,041 per month for SINOT and approximately $78,000 per month for the retirement program, and $4,500 per month in income from renting out a parking lot. Combined with the Union's income in dues (as reflected in the average income above), the total amount of non-Health Plan contribution income averaged approximately $300,000 per month. This, again, is only a small percentage of the millions per month the Union was receiving in Health Plan contributions, with the Health Plan contributions representing approximately 77% ($1 million out of $1.3 million total) of the total amount of commingled funds based on the lowest Health Plan contribution.

---

[33] Like the Health Plan contributions at issue in this appeal, the Defendants were similarly constrained in their use of these other funds. In addition, the funds were similarly not reported in the Union's balance sheets. In essence, the Defendants argue that their convictions cannot stand because they were guilty of embezzling different funds.

The Defendants further counter by focusing on the specific accounts from which the Defendants paid themselves. Although, as a whole, the funds that the Union received in Health Plan contributions far outweighed the funds that the Union received from other sources, the Defendants argue that the amount of Health Plan contributions contained in the accounts vis-a-vis other funds were not proportionally high enough to support the convictions.

For example, the Defendants point to the testimony of Jennifer Griffin, who did a "deposit source" analysis of the funds contained in the Infrastructure Account, as shown in the table below:

1998: **69% Health Plan**
22% SINOT
9% Cultural Trips Account

1999: **74% Health Plan**
18% SINOT
8% Cultural Trips Account

2000: **75% Health Plan**
16% SINOT
5% Cultural Trips Account
4% Union Account

2001: **47% Health Plan**
27% SINOT
15% Union Account
11% Cultural Trips Account

2002: 45% Union Account
**36% Health Plan**
16% SINOT
3% Cultural Trips Account

2003: 72% Union Account
15% SINOT
8% Cultural Trips Account

**5% Health Plan**

2004:  57% Investment Redemptions
       32% Union Account
       **8% Health Plan**
       3% Welfare Account

Although for the first three years of the scheme 69 percent (1998), 74 percent (1999), and 75 percent (2000) of the funds contained in the Infrastructure Account were derived from Health Plan funds, the amounts declined in 2001 to 47 percent, and further declined to 36 percent (2002), 5 percent (2003), and 8 percent (2004). The Defendants seize on this decline to argue that, on average, the percentage of Health Plan funds contained in the Infrastructure Account was approximately 44 percent, below the 75 to 80 percent threshold articulated in some § 641 cases.

The government counters that the "deposit source" analysis is somewhat misleading. It notes that, even in those years where the Infrastructure Account contained a small percentage of funds directly diverted from the Health Plan, it still received a significant percentage of funds from the Union Account, which itself contained funds from the Health Plan. In 2003, for example, and as shown by the complicated flow charts prepared by Griffin for trial, $19.4 million of the AAA's Health Plan contributions were deposited into the Union Account. From there, $14.8 million was passed into the Plan Account (via the Welfare Account), with $4.1 million remaining in the Union Account. And then from there, an additional $873,000 was transferred from the Plan Account to the

Union Account, which resulted in the Union Account containing well over $5 million of the Health Plan's funds. This exceeded by several million dollars any other sources of funds contained in the Union Account. Thus, the large percentage (72 percent) of Union Account funds contained in the Infrastructure Account itself contained a large percentage of Health Plan funds, such that, combined with the 8 percent of Health Plan funds already contained in the Infrastructure Account, Health Plan funds comprised a substantial portion of the funds in the Infrastructure Account. However, the government did not establish at trial the "true" total percentage of Health Plan funds contained in the Infrastructure Account.

As the above evidence shows, and in contrast to Gibbs, this case involves multiple accounts with commingled funds, with those accounts funneling Health Plan funds into each other. This scenario presents further opportunities for abuse.[34] However, based on our review of the specific evidence in this case, drawing all reasonable inferences in favor of the verdict, we conclude that, as in Gibbs and Evans, Health Plan funds were a substantial portion of the funds in the commingled accounts.

---

[34] For example, one might funnel small values of embezzled funds through an account that contains mostly non-embezzled funds, such that embezzled funds never comprise a substantial portion of that account. Although we conclude in this case that the Infrastructure Account did contain mostly Health Plan funds, as a hypothetical matter, we find it difficult to believe that a defendant could avoid liability through such a scheme.

First, we stress again that the disparity between the Health Plan contributions as compared to the Union's other sources of funds was staggering. The Union received in the realm of 70 to 80 percent of its funds from Health Plan contributions, as compared to all other sources (including funds, such as SINOT and the funds for the retirement program, that the Union was not permitted to use as income). Moreover, and as the evidence showed, the Health Plan funds were commingled <u>among</u> the accounts from which the Defendants paid themselves, such that a rational juror could conclude that, at any given time, the Accounts contained Health Plan funds. That alone is sufficient under <u>Gibbs</u> to establish the "substantial portion" prong.

Second, we note that the 75 to 80 percent level discussed in <u>Gibbs</u> and <u>Evans</u> is not a threshold. Indeed, the Seventh Circuit upheld a conviction under § 641 where as little as 50 percent of the commingled funds were federal. <u>See</u> <u>United States</u> v. <u>Mitchell</u>, 625 F.2d 158, 161 (7th Cir. 1980) (concerning theft of check from Aid to Families with Dependent Children account containing 50 percent federal funds). Thus, almost all of the years for the Infrastructure Account contained a sufficient portion of Health Plan funds. For all of these reasons, we conclude that, as in <u>Gibbs</u> and <u>Evans</u>, the evidence is sufficient to show that the Health Plan funds were a substantial portion of the funds embezzled from the commingled sources.

Based on the above, we conclude that the evidence was sufficient in this case to permit a rational jury to convict the Defendants for each of the substantive embezzlement counts.

### b. "without authority"

Defendants next contend that there was insufficient evidence to prove that they were "without authority" to receive the Health Plan funds. The Defendants argue that they were entitled to additional compensation for the work they performed on behalf of the Health Plan, and that this compensation was authorized by the collective bargaining agreement, the constitution, the Plan bylaws, and "historical practice."

We conclude that the evidence was sufficient in this case to establish that the Defendants acted "without authority." We stress at the outset that the issue is not whether the Defendants were anywhere explicitly prohibited from receiving payments from the Health Plan for services rendered; rather, the issue is whether they lacked the authority to do so. See United States v. Hammond, 201 F.3d 346, 349 (5th Cir. 1999) (per curiam) (although union president did not "break any law or union rule" in spending political funds, court affirmed conviction because a "rational juror" could conclude that expenditure was unauthorized). And, in this case, the Defendants lacked such authority.

The Defendants first point to the purported "administrative services" contract they provided to OIC, but that

is a nonstarter. The evidence at trial showed that the contract was replete with irregularities, overcharged for services, was created after the fact, was ultimately rejected by the OIC, and the government provided evidence that the minutes supporting the contract were forged. The Defendants claimed that the OIC "mistakenly" rejected the contract "on the assumption that [the Defendants] could not receive such compensation because they were paid labor license." Even if true (which it is not, as detailed in the OIC rejection letter), the contract was nonetheless rejected, and cannot authorize the Defendants' actions in this case.

The Defendants further point to a number of provisions in the Health Plan bylaws, the constitution, and the collective bargaining agreement that would permit compensation or at least not prohibit it. For example:

* The Health Plan bylaws establish the authority of the board of directors to "set[] salaries of officials";

* The constitution states that "the [CEC] will fix the representative expenses and the bonuses of the Union's Officers";

* The collective bargaining agreement puts Lugo in charge of "managing and directing the rendering of services."

These provisions, if exercised, may have provided authority for the Defendants' compensation. But there was no evidence, such as a formal resolution, meeting minutes, or any other documentation that

showed that the Defendants exercised those provisions. Thus, these provisions cannot supply the necessary authority for their actions.

The Defendant next argue that, as a matter of practice, they received compensation for the services they provided for the Health Plan. They point to the testimony of Rubén Luciano, who testified that, under the Old Health Plan, "there was always compensation paid to the Board of Directors." But this purported historical practice lacks any formal resolution or other authorization. Moreover, unlike the Old Health Plan, the Health Plan was subject to Puerto Rico's Insurance Code, and under the Code the Health Plan was required to seek approval from the OIC, and to "furnish to the Commissioner the adequate information to justify the" delegation of administrative services to the Defendants. See P.R. Laws Ann. tit. 26, § 1905(2)(a). The evidence showed that the Defendants failed to do so in this case, and thus they cannot resort to their historical practice as a source of authority.

Finally, the Defendants challenge testimony given by Aurea López, the OIC's chief investigator into the Union's scheme, concerning the Defendants' labor license.[35] At trial, López testified to the following:

---

[35] The Defendants do not present this challenge as a separate basis for reversal, but as part and parcel of their claim that the evidence establishing their lack of authority was insufficient."

> The reason for excluding those enjoying Union leave is that the position held by the Commissioner of Insurance is that those persons were already being compensated by AAA so that they could offer services to the Union. So we understood that it was also not correct that the [Health Plan] be charged for services that these people rendered to the [Health Plan].

The Defendants claim that López provided unqualified opinion testimony to the effect that the labor license prohibited the Defendants from receiving additional compensation for their work on the Health Plan. See Fed. R. Evid. 702 (permitting opinion testimony if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case"). The Defendants point out that López was not established as an expert on the Union's activities to opine on the labor license. The government argues that, when read in context, López was only giving testimony on historical fact as to the OIC's conclusion that the Defendants' six percent charges for services were unreasonable in light of prevailing market rates.

We need not decide the issue, because any error in admitting the testimony was harmless, because it would not have "affected the outcome of the trial." United States v. Dunbar, 553 F.3d 48, 59 (1st Cir. 2009)("'The essential inquiry in harmless error review is whether the improperly admitted evidence likely affected the outcome of the trial.'" (quoting United States v. Tom,

330 F.3d 83, 95 (1st Cir. 2003)).  As noted above, there was <u>no</u> evidence of any authorization for the payments the Defendants received.  The Defendants claim prejudice because, they argue, the government relied upon López's testimony at trial in support of its theory that the Union's labor license precluded compensation for Health Plan work, and even cited it in their closing.  However, the government argued below, as here, that no provision in the constitution, collective bargaining agreement, the Health Plan by-laws, or any other document provided authority for the payments.  Moreover, no mention was made of López's testimony in the government's closing.  Thus, for all of the above reasons, the evidence was sufficient to permit a rational jury to conclude beyond a reasonable doubt that the Defendants acted without authority.

### c.  "knowingly and willfully"

The Defendants finally argue with respect to the embezzlement convictions that the government had not met their burden to prove that the Defendants acted with the requisite criminal intent to be convicted of embezzlement.

To establish an individual defendant's willing and knowing participation in a conspiracy as in this case, the government "need not prove that [he] knew all the details . . . or participated in all of the objectives . . . of the conspiracy." <u>United States</u> v. <u>Brandon</u>, 17 F.3d 409, 428 (1st Cir. 1994).  The

prosecution need only "show knowledge of the basic agreement," with "an intent to commit the underlying substantive offense." Id. The requisite knowledge and intent can be proven through "circumstantial evidence, including inferences from . . . acts committed by the defendant that furthered the conspiracy's purposes." Id.

With respect to the Top Four Defendants, the evidence of their knowledge and willfulness with respect to the embezzlement convictions was more than sufficient. They all essentially argue that their actions were done in good faith. However, the evidence conclusively contradicts this assertion.

We start with Lugo and Román. Among other things, the evidence showed that Lugo and Román, as president and treasurer of both the Union and the Health Plan, had signing authority over all of the bank accounts at issue in this case, and thus signed all of the checks and other documents authorizing the transfer of funds to and from various bank accounts. Lugo and Román also signed off on regular checks made out to themselves and the other Defendants which were deposited into personal accounts. Their consenting signatures are also on Health Plan tax returns that omitted these payments.

Lugo and Román were also instrumental in the creation of the administrative services contract, under which the Union leaders paid themselves a six percent of Health Plan funds for

administering the Health Plan.  They also provided vague and misleading responses about the specifics of the contract during the course of the OIC's investigation.  The administration contract was ultimately found to be invalid by the OIC after it was discovered that the fees the Union charged were substantially above market rates and concerns about the legitimacy of the arrangement were uncovered.  Despite being informed of this decision, Lugo and Román continued issuing personal payments from Union controlled funds, which further showed their intent.  Cf. Young, 955 F.2d at 103-04 (evidence sufficient to show intent to embezzle where defendant's "falsification" to a government agency "reveal[ed] a consciousness of guilt" (quotation omitted)).  Thus, through all of these actions, both Lugo and Román displayed knowledge and willfulness with respect to the embezzlement scheme in this case.

The same is largely true of the actions of Carrasquillo. Even though he lacked signing authority, Carrasquillo controlled the Union and Health Plan accounts after Román's retirement in April 2004.  He was also consistently obstructive when the OIC made inquiries into the administrative services contract.  These facts would permit a reasonable jury to conclude that Carrasquillo was knowingly involved in an embezzlement scheme.

García, like Lugo and Carrasquillo, also played a significant role in the implementation of the administrative service contract.  Although she insists that she was cooperative

with the OIC in her investigation, which she asserts is proof that she did not have the intent to embezzle, her role in creating the administrative contract itself (and providing the forged minutes to support the contract) provides substantial evidence of her intent.

Most importantly, none of the Top Four Defendants included any of the income they received as compensation from the Health Plan in their tax returns and, when confronted with evidence of their scheme, promptly reported the income, literally within days of each other. That alone is significant evidence of their knowledge and willfulness. See United States v. Fusaro, 708 F.2d 17, 21 (1st Cir. 1983) ("Fusaro's active participation in so many aspects of the scheme as well as his attempts to cover up the scheme as it unraveled, likewise, provides the basis for the inference that he acted with the requisite intent and knowledge.").

The Top Four Defendants each argue that their failure to file taxes on their Health Plan income is evidence of tax evasion, but not of embezzlement. However, as noted below, the jurors were instructed that "the case that is before us . . . has nothing to do with tax evasion," and jurors are presumed to follow instructions. See United States v. Bradshaw, 281 F.3d 278, 285 (1st Cir. 2002) ("[I]t is routinely presumed that jurors will follow curative instructions . . . ."). In any event, the Defendants conveniently only failed to report their Health Plan income, thus permitting a

rational jury to conclude that the Defendants were not simply engaging in tax evasion.

The issue is much closer with respect to the Chapter President Defendants. As noted below, the evidence was insufficient to support their convictions for money laundering because minutes establishing their knowledge turned out to be forged. Moreover, unlike the Top Four Defendants, the Chapter Presidents had no authority over any of the Union-controlled accounts.

The government does not dispute that the Chapter President Defendants' role in the crime was more limited than that of the other Defendants, but argues that the evidence was still sufficient to establish their intent. The government primarily argues that the Defendants were willfully blind to the scheme, and points out that the district court in this case provided a willful blindness instruction.[36] The government points out that, despite the forged minutes, García certified to the OIC that "all . . . members" of the Health Plan's board of directors "discuss[ed] and analyze[d] the diversity of administrative issues of their incumbency on a daily basis." The government also points out that Clotilde Díaz, who ran the Union's cafeteria, testified that "all"

_____

[36] It is unclear whether the Defendants challenged the willful blindness instruction as a separate ground for reversal. To the extent that they did, any such error was harmless because, as discussed below, the evidence was sufficient to support their direct knowledge of the scheme.

the Defendants would have lunch together "every day whenever they were there." The government finally points out that the Health Plan's bylaws required the Defendants to "manage[]" the Plan and "oversee[] the faithful compliance with the laws and regulations applicable to the operation of" the Health Plan, such that the jury could infer that the Chapter President Defendants knew that there was nothing that authorized them to receive payments.

The Chapter President Defendants respond by pointing out that García's certification is far from credible. Moreover, Díaz's testimony, to the extent that it can be interpreted to mean that the Defendants ate lunch "every day," was belied by the lunch tickets presented at trial, which only showed that they met with the Top Four Defendants infrequently, if at all.

The evidence in support of willful blindness is sparse, at best. Willful blindness requires evidence that the Chapter Defendants were "trying to deliberately avoid knowledge" of the scheme, see United States v. Azubike, 564 F.3d 59, 68 (1st Cir. 2009), and the government can only muster a few meetings with the Top Four Defendants and some duties on the part of the Chapter President Defendants to manage the Health Plan. None of these actions conclusively show the Chapter President Defendants "deliberately avoid[ing]" knowledge of the embezzlement.

However, like the Top Four Defendants, the Chapter President Defendants failed to report the income they received from

the Health Plan in their tax returns, even though the purported Health Plan income was far greater than the other income they reported. More importantly, and also like the Top Four Defendants, they all proceeded to report their payments simultaneously at a time when the OIC was discovering the extent of the scheme. This, along with the other evidence, was sufficient for the jury to conclude by proof beyond a reasonable doubt the element of criminal intent. The Chapter President Defendants argue that they did not know that they had to report the payments and, at worst, only engaged in tax evasion. Although that is one view of their actions, the jury was permitted to conclude that the confluence of events here established their knowledge and willfulness by proof beyond a reasonable doubt. See United States v. Dwinells, 508 F.3d 63, 74 (1st Cir. 2007) ("When the record is fairly susceptible of two competing scenarios, the choice between those scenarios ordinarily is for the jury.").

### 2. The Money Laundering Convictions

Defendants also challenge the sufficiency of the evidence in support of their money laundering convictions under 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i), & (h). 18 U.S.C. § 1956 provides, in relevant part:

> [w]hoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity[,]

-57-

> . . . knowing that the transaction is designed
> in whole or in part . . . to conceal or
> disguise the nature, the location, the source,
> the ownership, or the control of the proceeds
> of the specified unlawful activity[,] . . .
> shall be sentenced to a fine . . . or
> imprisonment . . . or both.

18 U.S.C. § 1956(a)(1)(B)(i); see also United States v. Cruzado-Laureano, 404 F.3d 470, 483 (1st Cir. 2005) (discussing elements of money laundering).

As an initial matter, the government concedes that the money laundering convictions of the Chapter President Defendants -- Caraballo, Andino, Martínez, Ramos, Vázquez, Urbina, and Roldán -- must be reversed for insufficient evidence, as a result of the expert testimony that the meeting minutes, upon which their knowledge of the money laundering scheme was based, were forgeries. Thus, we only address the claims of the Top Four Defendants.

To recap, the money laundering convictions were based on loans provided to the Health Plan by the Union through the Welfare Account. Because the Welfare Account (which did not appear in either the Union or Health Plan books) consisted solely of Health Plan contributions, the Health Plan, in effect, was loaning money to itself. These "fake" loans were an attempt to launder the Plan funds for use by the Defendants, since the money paid back to the Union by the Health Plan, in the government's words, "would look like fulfillment of a legitimate loan obligation," plus interest to boot. To further conceal the scheme, Lugo, Román, and García

submitted paperwork to the OIC authorizing the Health Plan's administrator to seek the loans in question. The paperwork represented that the Union would be lending Union funds, which was not the case, as transaction records show that the money came from the Welfare Account. When Luciano, the Health Plan's accountant, pointed out the misrepresentation, he was fired. Moreover, the government's documents expert, LaPorte, testified that the Health Plan's minute book was doctored to reflect meetings that were never held.

Román and Lugo argue that their convictions should be set aside in light of United States v. Santos, 128 S. Ct. 2020 (2008), where a plurality concluded that the term "proceeds" under § 1956(a)(1) means "profits" rather than "receipts." See id. at 2031. There is some question whether Santos applies to this case. Santos concerned money laundering convictions based on payments to winners and employees of an illegal gambling operation, and applying the money laundering statute to such essential steps of the gambling operation raised a significant merger problem. Id. 2026. Such a merger problem is not present here, where the "fake loan" scheme was in addition to the Defendants' embezzlement scheme, was not essential to it, and was concocted after the embezzlement scheme was in effect. Moreover, there is some question as to the holding of Santos, since Justice Stevens, the fifth and deciding vote, suggested in concurrence that the holding

may vary by offense and the legislative history.  See id. at 2032-33; see also United States v. Kratt, No. 08-5831, 2009 WL 2767152, at *4 (6th Cir. Sept. 2, 2009) (interpreting Santos to apply when application of § 1956 "creates a merger problem that leads to a radical increase in the statutory maximum sentence and only when nothing in the legislative history suggests that Congress intended such an increase").  But even if Santos applied, the transactions at issue clearly concerned the "profits" of the embezzlement scheme, given the large amounts of Health Plan funds diverted and the minimal expenses to do it.  See Santos, 128 S. Ct. at 2029 (stating that "to establish the proceeds element under the 'profits' interpretation, the prosecution needs to show only that a single instance of specified unlawful activity was profitable and gave rise to the money involved in a charged transaction").

Román and Lugo, along with the remaining Top Four Defendants Carrasquillo and García, also argue that they did not embezzle Health Plan funds at all, let alone engage in money laundering.  For the reasons discussed above, we reject the claim. Lugo and Román separately argue that only a "bumbling bunch of conspirators would conspire to hide proceeds of an activity they knew to be illegal by writing themselves checks and cashing them in their own names."  But that is no defense.  See United States v. Majors, 196 F.3d 1206, 1214 (11th Cir. 1999) ("Moving money through a large number of accounts" may suffice to prove money laundering

even where the defendant "withdr[aws] [funds from accounts] in his own name") (citations omitted); <u>United States</u> v. <u>Sutera</u>, 933 F.2d 641, 648 (8th Cir. 1991) ("[T]he money laundering statute does not require the jury to find that [the defendant] did a good job laundering the proceeds."). Carrasquillo argues that he opened the Welfare Account to avoid fines for depositing unapproved rates. His actions betray this excuse, as Carrasquillo could have simply asked for an approved rate, the Defendants continued to use unapproved rates after establishment of the Welfare Account, and the Union was fined anyway. Thus, a rational jury could have concluded beyond a reasonable doubt that Carrasquillo created this excuse to conceal the loan scheme. We thus conclude that the evidence was more than sufficient to support the money laundering convictions with respect to the Top Four Defendants.

## B. Jury Instructions

Defendants also challenge several jury instructions provided at trial. As we have previously stated,

> We review a properly preserved objection to "the form and wording" of an instruction given by the district court for abuse of discretion. <u>United States</u> v. <u>McFarlane</u>, 491 F.3d 53, 59 (1st Cir. 2007). "While we would review <u>de novo</u> a claim that an instruction embodied an error of law," we also "review for abuse of discretion 'whether the instructions adequately explained the law or whether they tended to confuse or mislead the jury on the controlling issues.'" <u>United States</u> v. <u>Silva</u>, 554 F.3d 13, 21 (1st Cir. 2009) (quoting <u>United States</u> v. <u>Ranney</u>, 298 F.3d 74, 79 (1st Cir. 2002)). A trial court's refusal to give

-61-

> a particular instruction is reversible error
> only in the "relatively rare case" in which
> "the requested instruction was
> (1) substantively correct; (2) not
> substantially covered elsewhere in the charge;
> and (3) concerned a sufficiently important
> point that the failure to give it seriously
> impaired the defendant's ability to present
> his or her defense." United States v.
> Prigmore, 243 F.3d 1, 17 (1st Cir. 2001).

United States v. González, 570 F.3d 16, 21 (1st Cir. 2009). Furthermore, "[a]ny error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Fed. R. Crim. P. 52(a) (setting forth harmless error standard).[37]

Where the defendants fail to object to the court's jury instructions at trial, we review for plain error. See United States v. Griffin, 524 F.3d 71, 76 (1st Cir. 2008). To establish plain error, a defendant "must show an error that was plain, (i.e., obvious and clear under current law), prejudicial (i.e., affected the outcome of the district court proceedings), and that seriously impaired the fairness, integrity, or public reputation of the judicial proceedings." Id.

> This standard is so demanding that we have
> characterized it as "cold comfort to most
> defendants pursuing claims of instructional
> error," United States v. Medina-Martínez, 396
> F.3d 1, 8 (1st Cir. 2005), because, "[w]hile

---

[37] We note that none of the challenges here involve a claim of structural error, which would not require a showing of prejudice. See United States v. Brandao, 539 F.3d 44, 58 (1st Cir. 2008) (defining structural errors as "constitutional errors that deprive the defendant of a fundamentally fair trial and thus may not be found harmless under Rule 52(a)'s harmless error standard").

reversal of a conviction predicated on unpreserved jury error is theoretically possible, . . . [it is] the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." United States v. Weston, 960 F.2d 212, 216 (1st Cir. 1992).

González, 570 F.3d at 21 (modification in the original).

Finally, the Supreme Court has "repeatedly . . . cautioned that instructions must be evaluated not in isolation but in the context of the entire charge." Jones v. United States, 527 U.S. 373, 391 (1999).

## 1. Embezzlement Instruction

The Defendants first challenge certain portions of the district court's "legal background" as part of the court's instruction concerning 18 U.S.C. § 669. They do not challenge the instructions on the elements of § 669 themselves. Rather, the Defendants challenge the following: (a) the district court's instruction that AAA's contributions were Health Plan assets for purposes of § 669; (b) the district court's instruction with respect to commingling; and (c) its instruction concerning "fiduciary principles."

### a. instruction that AAA's contributions belonged to Health Plan

The Defendants challenge the following instruction given by the district court:

[T]he [H]ealth [P]lan had a vested property interest in [the AAA's monthly] contributions[,] such [that] they constitute

-63-

> health plan assets under 18 U.S. Code, Section
> 669.

The Defendants argue that, by instructing the jury that the Plan had a "vested property interest" in the AAA monthly contributions, the district court took from the jury "an essential element of the government's case." For support, the Defendants cite United States v. Alessio, where we reversed and remanded for a new trial when the district court made a "finding" during the relevant witness's testimony that the specific funds the defendant allegedly misdirected under Section 641 were "the property of the United States." 439 F.2d 803, 804 (1st Cir. 1971) (per curiam). Moreover, the Defendants argue that the instruction is at odds with the government's concession in Jackson that employer contributions to an ERISA plan "themselves are not assets of [a] plan until the contributions are paid to the plan." Jackson, S. Ct. No. 08-263, U.S. Br. at 10.

This case is distinguishable from Alessio. Unlike in Alessio, the district court did not instruct the jury that the funds the Defendants actually embezzled were Health Plan funds. Rather, and as the government correctly points out, the district court simply described that the AAA contributions generally were for the Health Plan, and specifically charged the jury with determining "beyond a reasonable doubt" whether the specific "payments that came into the . . . possession of the defendants" were Plan funds. Cf. Evans, 572 F.2d at 471, 473 (in § 641

-64-

embezzlement case, affirming use of jury instruction describing "federal character of the monies generally involved").

However, the instruction is in some tension with the government's concession in <u>Jackson</u>.  Although here we express some doubt that <u>Jackson</u> applies to this case, we conclude that any error was harmless.  First, and as noted above, the district court did not instruct the jury as to any element of the offense, and thus the Defendants were free to argue their theories to the jury.  Second, and as discussed in more detail above, at all relevant times most or all of the Health Plan contributions were, in fact, deposited in the Plan Account to conclusively establish that the Health Plan had a "vested property interest" in the funds.

### b.  commingling instruction

The district court instructed that, "[b]ecause the [H]ealth [P]lan fund[s] [were] not . . . [U]nion property," they "should not" as a general matter have been "commingled with other [U]nion funds."  It went on to say:

> [t]he mere fact that funds may have been transferred from other accounts or commingled with other [U]nion funds is not enough to create criminal liability.  Such co[m]mingling could have occurred for a number of reasons, such as bad advice from accountants, bad management practices on the part of some officer or officers, or because of mistakes or other innocent reasons.
>
> But when the diversion is knowingly and willfully made into other [U]nion accounts, unrelated to the [H]ealth [P]lan, with intent to embezzle or with intent to resupply [Union

money], then we [have] conduct that may constitute a federal offense under 18 U.S. Code, Section 669.

"[A]t the risk of repetition," the court further stated:

> remember that the commingling of funds standing alone, without proof of criminal intent proven beyond a reasonable doubt, cannot . . . give rise to criminal liability. Precisely and for this reason, the government must prove beyond a reasonable doubt, by either direct or . . . circumstantial evidence[,] that the commingling of funds was part of the criminal plan to embezzle [P]lan funds, monies or assets. Proof beyond a reasonable doubt of each and every element of the offense charged is required for the government to establish that [the] charged conduct is criminal in nature[,] and that of course is for you to decide.

The Defendants contend that the district court improperly instructed the jury that commingling is illegal per se.[38] But the plain terms of the charge did not provide such an instruction. The district court did not instruct the jury that commingling is per se illegal. Instead, as shown above, the district court repeatedly emphasized that "[t]he mere fact that funds may have been transferred from other accounts or commingled with other [U]nion funds is not enough to create criminal liability." (Emphasis added). We thus reject the Defendants' claim.

---

[38] García and Vázquez argue that the government argued in closing that commingling itself "made the receipt of all compensation by [the defendants] illegal." However, they cite no transcript page for that claim, and we cannot find any record of it.

-66-

### c. "legal principles" instruction

The Defendants challenge a "legal principles" instruction that the district court provided sua sponte. The district court instructed the jury that:

> When persons hold money in trust for other persons, or for particular purposes, they have a fiduciary duty to use the trusted funds in good faith and in a scrupulous manner, acting always in the best interests of the beneficiaries.
>
> Duties general to any fiduciary relationship arise when the trust in question is, as here, a health care benefit program. You, the jury, may consider in your evaluation of the evidence whether and to what extent the government has proven beyond a reasonable doubt in this case that these fiduciary rules were or were not followed.
>
> And there are some rules I'm going to give you as guidelines. These may not be the only rules. You may think of other rules or principles that are so obvious that I may not even put in here to give you some aid in figuring this out.

The court then provided a non-exclusive list of fiduciary principles that the jury could "consider" in determining whether the government had "prove[n] beyond a reasonable doubt" that a particular defendant acted "knowingly and willfully [with] the intent to embezzle." The court stated, in full:

> There are some rules that you may consider in determining whether any of the charged conduct was willfully, knowingly and intentionally made for the purpose of violating the law, or whether the charged conduct was entered into by mistake, bad management or other innocent reasons.

-67-

Remember that bad management, careless or innocent reasons by themselves do not constitute a crime. Repeating myself a second: The government must prove beyond a reasonable doubt that the conduct charged in the indictment was knowingly and willfully performed, that is to say, the intent to embezzle or misapply as contemplated in 18 U.S. Code, Section 669.

The first rule that may assist you in figuring out whether criminal intent exists or does not exist is what can be defined as the "solely-in-the-interest rule." This rule requires that management of health plan contributions be solely in the interests of the participants and the beneficiaries.

The second rule that may assist you in figuring out whether criminal intent existed or not is the "exclusive person rule." This rule requires that the management of the health plan contributions, or the health plan contributions be for the exclusive purpose of proving benefits to the participants and their beneficiaries; and also for the defraying reasonable expense of administering plan.

The third rule that you can use in the process of assessing whether criminal intent or noncriminal reasons were behind the charged conduct is the "prudent person rule." Members of the board of directors of the health plan must be prudent persons, executing their fiduciary duties with care, skill, prudence, under the circumstances then prevailing. The prudent person rule requires the trustees to be familiar with the matters of the enterprise for which they act.

The fourth rule that may assist you in figuring out whether criminal intent exists, or whether there was no criminal intent in the charged actions, is what I refer to as the "plan documents rule." Plan documents include managerial organization charts, written descriptions of authorized positions, written descriptions of duties for each position,

employment contracts, and any scope that these employment contracts may contain, Board of Directors' decisions and minutes under the legal structure of the plan under its corporate bylaws, and any other contemporaneous document that confirms or denies that the management decisions were made and contemplated as the exclusive purpose, providing benefits to the participants and their beneficiaries and defraying reasonable expenses of administration.

The fiduciary must act in accordance with the documents and instruments governing the health plan insofar as such documents and instruments are consistent with the provisions of law.

To evaluate and enforce these duties in the context of a criminal statute you may focus not only on the merits of the transaction, but also on the thoroughness of the investigation made by the fiduciaries into the merits of such.

As I have already advanced, I also instruct you that a good faith or a negligent breach of fiduciary duties, standing alone, does not create a criminal liability, but can be instructed along with other factors mentioned as to whether criminal intent is or is not present.

The Defendants primarily contend that the district court's instruction as to fiduciary principles were "lengthy, legally incorrect, and complex," such that the district court "engrafted" civil ERISA law onto Section 669 and thereby "relieved the prosecution's evidentiary burden" to prove all elements beyond a reasonable doubt. They also argue that the Defendants' actions were authorized and that they owed no fiduciary duty, so the instructions were misplaced.

-69-

We agree that the instruction is certainly "lengthy" and "complex." Indeed, it is difficult to characterize the instruction as anything but confusing, and we do not sanction it in any way. Nevertheless, "instructions must be evaluated not in isolation but in the context of the entire charge," Jones, 527 U.S. at 391 (citations omitted), and based upon our review of the instruction as a whole, we conclude that the instruction was harmless. First, although the district court borrowed principles from the ERISA context, the court stated that the jurors "may consider" the rules. Second, the district court repeated twice within this instruction that "[t]he government must prove beyond a reasonable doubt that the conduct charged in the indictment was knowingly and willfully performed," and further instructed on this requirement four other times in the jury charge. Third, the district court instructed the jury at the beginning of its instruction "that bad management, careless or innocent reasons by themselves do not constitute a crime" and at the end that "a good faith or a negligent breach of fiduciary duties, standing alone, does not create a criminal liability." Thus, read as a whole, the instruction did not result in an error warranting reversal. Cf. United States v. Snyder, 668 F.2d 686, 690-99 (2d Cir. 1982) ("We agree with appellant that he should not be convicted of a crime merely because he breached his civil fiduciary duties. But [the court] was careful to make that point, and we have no doubt that the jury grasped it.").

## 2.  **Money Laundering Instruction**

Román, Ramos, and Roldán separately argue that the district court erred in instructing on the elements of money laundering under 18 U.S.C. § 1956.  The government has conceded that the money laundering convictions against Ramos and Roldán should be reversed.  We thus focus on Román.

The district court gave the following instruction with respect to money laundering:

> First, that a defendant knowingly conducted or attempted to conduct a financial transaction[.] . . .

> Second, [that] the defendant knew that the monies or funds involv[ed] [in the] financial transaction represented the proceeds of some form of unlawful activity, in this case the embezzlement of monies from a health plan organization.

> Third, that the funds or monies involved in the financial transaction did in fact represent the proceeds of [that] specified [unlawful] activity[.] . . .

> Fourth, that the defendant engaged in [the] financial transaction knowing that the transaction was designed, in whole or in part, <u>to conceal</u> or to disguise the nature, the location, the source, the ownership or the control of the proceeds of such specified [unlawful] activity.

Because no defendant objected to the instruction prior to "the jury retir[ing] to deliberating," we review for plain error.  See Fed. R. Crim P. 30(d) ("A party who objects to any portion of the instructions . . . must inform the court of the specific objection

and the grounds for the objection before the jury retires to deliberate. . . . Failure to object in accordance with this rule precludes appellate review, except as permitted under Rule 52(b).").

There was no plain error. Román claims that the district court erred by only instructing the jury as to one theory of money laundering when two were charged, instructing on "conceal[ment]" under Section 1956(a)(1)(B)(i), but not on "to promote the carrying on of specified unlawful activity" under Section 1956(a)(1)(A)(i). However, Román cannot show that he was prejudiced because the district court failed to instruct on an alternative government theory. Román also claims that the instruction was "jumbled," but does not explain how the instruction was jumbled, and we thus deem this ground waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (citations omitted). Finally, Román cannot show prejudice because the district court did not define "proceeds" as "profits," see Santos, 128 S. Ct. at 2031 (defining "proceeds" as "profits" for purposes of the money laundering statute), because, as discussed above, a rational jury could find beyond a reasonable doubt that Román in fact engaged in a conspiracy to launder profits.

### 3. **Good Faith Instruction**

Román, Ramos, and Roldán also challenge the district court's instruction on good faith. They properly preserved their claim. However, because they only object as to the form and wording of the instruction, we review for abuse of discretion.

The district court provided the following instruction:

> In making a determination of whether a defendant acted with specific criminal intent to embezzle [Health Plan] funds or monies in violation of Section 669 of Title 18, or to conspire to violate Section 669[,] . . . you may consider . . . whether or not that defendant had a good faith belief that there was authorization by law, and whether or not that defendant had a good faith belief that [his or her] use of the [Plan's] funds was in furtherance of the interest of the [Plan].
>
> The government has the burden of proving that a defendant acted with the required intent[.] . . .
>
> [G]ood faith is an absolute defense to th[e] charge[s]. Accordingly, the government must prove in . . . the case of each defendant, that [1] the defendant did not believe in good faith that the use of the funds . . . would benefit the [Health Plan's] participants and beneficiaries[,] [and] [2] the defendant did not believe in good faith that his or her use of the fund[s] was authorized by the law.

(Emphasis added).

Román, Ramos, and Roldán first argue that the district court erred because the instruction shifted the burden of proof onto the Defendants, "requiring them to justify what the court clearly saw as some degree of wrongful conduct." However, as the

-73-

quoted section shows, the instruction plainly explains that the government had "the burden of proving that a defendant acted with the required intent."  Román, Ramos, and Roldán further argue that the instruction "eviscerated" their defense that "they had a good faith belief that the funds were Union funds."  Although the instruction sets forth two examples of good faith conduct that the jury "may" consider, it did not specifically preclude the Defendant's theory.  Thus, although perhaps not the most artful instruction, the district court did not abuse its discretion in providing it.

### 4.  <u>Rejection of Tax Evasion Instruction</u>

García, Román, Ramos, Vázquez, and Roldán all argue that the district court erred when it failed to instruct the jury during the jury charge that this is not a tax evasion case.  They claim, given the use of tax related evidence during the government's case in chief and closing, that declining their request to repeat the instruction prejudiced them.

During the government's case-in-chief, however, and at the Defendants' request, the district court did instruct the jury that this was not a tax evasion case.  The district court instructed as to the following:

> Members of the jury, this evidence that you are going to receive now regarding the income tax returns, I should tell you that . . . the case that is before us . . . has nothing to do with tax evasion.  Tax evasion is exclusively under the jurisdiction of the state courts,

not the federal courts. And the evidence is being allowed because the Government needs to present evidence as part of their effort to prove a number of elements in the federal offenses which they think have something to do with this. That is, of course, for you to decide at the end of the case, on the basis of the instructions that I will give you. And that is the only purpose. So this is not a tax evasion case. This is a healthcare programs fraud case. That is what it is.

None of the above Defendants objected to the district court's decision not to provide the same instruction during the jury charge, only Caraballo did, who does not join this argument on appeal. Thus, we review for plain error. See Fed. R. Crim. P. 30(a) ("Any party may request in writing that the court instruct the jury on the law as specified in the request. The request must be made at the close of the evidence or at any earlier time that the court reasonably sets."); see also United States v. Harris, 104 F.3d 1465, 1471 (5th Cir. 1997) ("[T]he greater weight of authority counsels that a party can rely upon the objection of his codefendant only if he joins in the objection," citing cases).

The above Defendants claim prejudice, but it is difficult to see how, when the mid-trial instruction was correct, and case law presumes that "jurors . . . follow the trial judge's instructions." United States v. Torres, 162 F.3d 6, 12 (1st Cir. 1998); see also United States v. Rivera-Gómez, 67 F.3d 993, 999 (1st Cir. 1995) ("[J]urors are not children.") overruled on other grounds by Jones v. United States, 526 U.S. 227 (1999). Moreover,

García specifically argues that prejudice may have resulted from the government's closing, but the government reminded the jurors in closing that "[t]his is not a tax evasion case."  We thus see no error.

## C.  Trial Procedure

The Defendants also raise a number of issues with respect to the district court's management of the trial.

### 1.  Mid-Trial Severance Challenge

Vázquez separately contends that the district court abused its discretion when it refused to grant a mid-trial severance based on his attorney's alleged conflict of interest. Vázquez argues that he was discouraged from testifying by his counsel as a result of this asserted conflict, affecting the outcome of the proceedings.

As background, Francisco Dolz, counsel for Andino, informed the government during its case-in-chief that Angel Tapia, counsel for Vázquez, had admitted to doctoring minutes concerning the Welfare Account.  The government filed a sealed motion informing the district court of the allegation, and requested a hearing.  The court held a hearing that same day, with Dolz testifying that Tapia had admitted to him that Tapia's handwriting appeared on the doctored minutes.  The district court ordered Tapia to respond, and the next day Tapia declared that the allegation was "totally untrue," but that the allegation created "a conflict of

interest" that required severing Vázquez's case mid-trial. The district court denied the motion, finding no conflict, but further required Tapia to respond to the allegation in writing. Tapia filed a sworn statement, stating that "I have never told attorney Francisco Dolz expressions to the effect that I have altered any minute or any document of any kind of the [Union]," and further stating that the allegation was based on a misunderstanding.

Vázquez appeals the denial of his mid-trial severance motion. Since a "mid-trial severance is . . . an extraordinary measure," we will "overturn [a denial for severance] only if [the court's] wide discretion is plainly abused." United States v. Sotomayor-Vázquez, 249 F.3d 1, 17 (1st Cir. 2001) (citations and quotations omitted). Moreover, where, as here, a defendant claims that a conflict of interest warrants a new trial, he "must show that the lawyer could have pursued a plausible alternative defense strategy or tactic and that the alternative strategy or tactic was inherently in conflict with or not undertaken due to the attorney's other interests or loyalties." Id. at 15 (quotation marks omitted).

Vázquez contends that Tapia's conflict of interest, particularly his purportedly doctoring the Welfare Account minutes, caused Tapia to discourage Vázquez from testifying. However, Vázquez's claim of "intimidation" has no support in the record, and Vázquez does not cite to any. Furthermore, Vázquez failed to file

any pro se motion contending that Tapia discouraged him from testifying, or claimed that he was prevented from doing so. In any event, the proper vehicle for relief for ineffective assistance of counsel is a motion under 28 U.S.C. § 2255, not direct appeal. <u>Cf.</u> <u>United States</u> v. <u>Genao</u>, 281 F.3d 305, 313 (1st Cir. 2002) ("[W]e do not entertain ineffective assistance claims on direct appeal absent an evidentiary record that allows us to evaluate the fact-specific allegations. The preferable vehicle for such claims is a collateral proceeding under 28 U.S.C. § 2255.") (citation omitted).

Given the lack of any record support to substantiate Vázquez's claim, and the process afforded to Vázquez by the district court, it is hard to see any abuse of discretion on the part of the district court in denying a severance. Accordingly, we hold that the district court did not abuse its discretion in refusing to sever mid-trial.

### 2. <u>Misstatement in Closing Argument</u>

García and Vázquez both argue that the district court abused its discretion when it declined to grant them a new trial based on an alleged misstatement made during the prosecution's closing argument.

As we noted earlier, during the strike in 2004, the Union paid each of its members $300 every two weeks. In its rebuttal closing argument, the prosecution argued that (1) this money came

from the Union Account; (2) the Union Account contained Health Plan funds; and (3) the Plan thus helped pay for the strike, even though its funds were not meant for that purpose. The prosecutor further stated:

> I did my math. And it's approximately $5.8 million that the [U]nion dished out for those picketing workers on the lines, the striking people, the people that were out. And I'm not saying that those people don't deserve to get monies. I'm saying not from health care funds. Where did the [U]nion get $5.8 million during the strike? Where did the [U]nion get the money to pay Héctor René Lugo and all these people?

None of the defendants contemporaneously objected to this line of argument during the closing itself, but they all objected at a sidebar afterward. They claimed that the argument was "false" because, according to them, the money for the picketing workers came from a Union "strike fund," not from Health Plan funds. The district court overruled the objection.

As García and Vázquez preserved their claim, we review de novo whether the prosecution's remarks were improper. United States v. Nelson-Rodríguez, 319 F.3d 12, 38 (1st Cir. 2003); see also United States v. Robinson, 473 F.3d 387, 393 (1st Cir. 2008) ("We review de novo whether a challenged statement by the prosecutor during closing argument was improper.") However, we review for "manifest abuse of discretion" a district court's "refusal to grant a new trial." United States v. Potter, 463 F.3d 9, 22 (1st Cir. 2006). Even if the remarks are improper, we affirm

-79-

unless they prejudiced the defendant. United States v. Joyner, 191 F.3d 47, 53 (1st Cir. 1999). We consider the following factors in considering prejudice:

> (1) the severity of the prosecutor's misconduct, including whether it was deliberate or accidental; (2) the context in which the misconduct occurred; (3) whether the judge gave curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendants.

Nelson-Rodríguez, 319 F.3d at 38 (quotation omitted).

García and Vázquez contend that the government's remarks at closing were improper, claiming that (1) the Union paid the striking workers from "Banco Santander [Account] No. 1310003987"; (2) that the account belonged to the Union, not the Health Plan; and (3) the Plan thus did not help pay for the strike, and the prosecution, in arguing to the contrary, had "misstate[d] evidence" and "misl[e]d the jury." In response, the government contends that "Banco Santander No. 1310003987" was the Union Account, as defined in the indictment, and, since the Plan funds were diverted to that Account, the government's remarks were factually accurate.

Even if improper, the remarks had no effect on the trial outcome, as the case concerned not how the striking workers were paid, but whether the Defendants paid themselves with money they knew did not belong to them. At best, this is a "stray remark" that is too inconsequential to warrant reversal. See United States v. Martínez-Medina, 279 F.3d 105, 119 (1st Cir. 2002). Finally, as

-80-

correctly noted by the government, the district court instructed the jury that closing statements are "not evidence." Accordingly, we  see no reversible error.

### 3.  **Post-Trial Threats and Harassment**

Caraballo, Andino, and Urbina argue that the district court abused its discretion in declining to grant them a new trial based on their post-trial allegations that Lugo and others discouraged them, through threats and harassment, from testifying.

As background, the Defendants were found guilty on June 16, 2006.  Six months later, during a December 6, 2006 sentencing hearing, Urbina alleged for the first time that Lugo and other unnamed individuals had issued veiled threats that had discouraged him, Caraballo, and Andino from testifying at trial on their own behalf.  Urbina further asserted that he, Caraballo, and Andino would have testified that they were not at the purported board meetings concerning the loans from the Union to the Health Plan.

On February 2, 2007, Caraballo, Andino, and Urbina moved for a new trial, arguing that the alleged threats constituted "newly discovered evidence" under Rule 33(b)(1) of the Federal Rules of Criminal Procedure.  The district court denied the motion, finding that any threats had not been "serious enough" to dissuade the defendants from testifying and that their decision not to testify was in fact a "strateg[ic]" one.

Caraballo, Andino, and Urbina renew their arguments on appeal, and contend that they are entitled to a new trial. "We review a district court's denial of a new trial motion for manifest abuse of discretion." United States v. Del-Valle, 566 F.3d 31, 38 (1st Cir. 2009). "The remedy of a new trial must be used sparingly, and only where a miscarriage of justice would otherwise result." Id. (citing United States v. Conley, 249 F.3d 38, 45 (1st Cir. 2001)).

> A defendant who seeks a new trial on the basis of newly discovered evidence bears a 'weighty burden' of establishing that: (1) the evidence was unknown or unavailable to the defendant at the time of trial; (2) failure to learn of the evidence was not due to lack of diligence by the defendant; (3) the evidence is material and not merely cumulative or impeaching; and (4) the emergence of the evidence will probably result in an acquittal upon retrial of the defendant.

Id.

There was no abuse of discretion. First, if their claims of threats were true, then obviously they would have known about the threats during trial. Thus, their evidence cannot be "newly discovered," as they cannot claim that the threats were "unknown or unavailable to [them] at the time of trial." See United States v. Wright, 625 F.2d 1017, 1019 (1st Cir. 1980). Second, they cannot show any prejudice. This is because their claim that they would have testified that they did not participate in purported board meetings concerning the loans from the Union to the Health Plan

-82-

would have _supported_ the government's theory that these meetings never occurred and that minutes over those loan meetings were doctored.

**D.  Sentencing**

Finally, some of the Defendants appeal their sentences. As a threshold matter, the government concedes that, because the convictions for the Seven Chapter Presidents for money laundering must be set aside, they are entitled to resentencing.  See United States v. Meader, 195 F.3d 66, 68 (1st Cir. 1999) (resentencing appropriate where the Court "[could] not say that the trial judge would have reached the same sentence within the range").  Since the government concedes that the Chapter President Defendants are entitled to resentencing, we decline to address any of their arguments with respect to their sentences.  Cf. United States v. Pinillos-Pietro, 419 F.3d 61, 74-75 & n.14 (1st Cir. 2005) (declining to reach drug quantity claims given vacatur and remand of sentences in light of government's concession of Booker error). We thus address only the sentencing challenges of the Top Four Defendants, and do not discuss the merits of the other Defendants' sentencing challenges.

**1.  Loss Calculation Enhancement**

Some of the Top Four Defendants contend that the district court erred in assessing against each of the defendants an 18-level

enhancement under the Sentencing Guidelines based on a "loss" calculation of between $2,500,000 and $7,000,000.

"Under the advisory guidelines regime, the district court can use the preponderance of the evidence standard to determine whether an enhancement applies." United States v. Pierre, 484 F.3d 75, 89 (1st Cir. 2007) (quoting United States v. Holliday, 457 F.3d 121, 130 (1st Cir. 2006)). Accordingly, we review the district court's "factbound" determinations for purposes of sentencing for clear error. Id. (citing United States v. Ventura, 353 F.3d 84, 89 (1st Cir. 2003)).

As background, the district court applied U.S.S.G. § 2B1.1(b)(1) (2005), and applied an 18-level enhancement for each defendant under Section 2B1.1(b)(1)(J), since the loss amount the court calculated (approximately $5.5 million, with $1.1 million added to Lugo and Román for misapplying additional funds) was between $2.5 million and $7.5 million. Application Note 3(E)(I) to U.S.S.G. § 2B1.1(b)(1) provides an offset for "[t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." We review the district court's determination for clear error.

On appeal, the Top Four Defendants all challenge the district court's loss calculation on two grounds: (1) none of them

could have foreseen the amounts that each of the other defendants would receive, such that each defendant's loss amount should, at the most, be the amount he or she individually received; see United States v. Codarcea, 505 F.3d 68, 72 (1st Cir. 2007) (under Section 2B1.1, a conspirator will be held accountable for losses within the scope of a conspiracy that "would have been foreseeable by a reasonable person in [the conspirator's] shoes"); and (2) the court should have credited them for "services rendered."

The first ground fails. The Top Four Defendants' extensive knowledge and control of the embezzlement scheme as a whole made the total amount foreseeable. As to the second ground, the Top Four Defendants premise their argument on the fact that their scheme was detected in 2004, but the evidence shows that the date of detection was as early as 2000, when the OIC audited the Health Plan. See U.S.S.G. § 2B1.1 cmt. n.3(E)(I) (defining "time of detection" as "the earlier of (I) the time of the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency"). By that time, the evidence showed that the AAA paid $1.2 million pursuant to the "labor license." Assuming the same amount for services rendered to the Plan, it would not lower the total amount embezzled below the $2.5 million threshold for the enhancement. Thus, we find no error.

## 2. __Lugo Enhancements__

Lugo separately argues that the court's factual findings with respect to his sentencing enhancements for (1) using sophisticated means, (2) deriving more than $1,000,000 from a financial institution, and (3) organizing or leading an extensive criminal activity, were clearly erroneous.

As background, at Lugo's sentencing, the district court assessed a base offense level of seven, pursuant to U.S.S.G. §§ 2S1.1(a)(1) & 2B1.1(a)(1), and then the following enhancements: an 18-level loss enhancement under U.S.S.G. § 2B1.1(b)(1), as already discussed; a two-level enhancement under U.S.S.G. § 2S1.1(b)(2)(B), because Lugo was convicted under 18 U.S.C. § 1956; a two-level enhancement under U.S.S.G. § 3B1.3, because Lugo abused a position of trust; a two-level enhancement under U.S.S.G. § 2B1.1(b)(9)(C), because Lugo used "sophisticated means" in committing the offense; a two-level enhancement under U.S.S.G. § 2B1.1(b)(14)(A), because Lugo derived more than $1,000,000 in gross receipts from a "financial institution[ ]"; and a four-level enhancement under U.S.S.G. § 3B1.1(a), because Lugo was an "organizer or leader" of an extensive criminal activity involving five or more participants. Lugo objected to the enhancements for using sophisticated means, deriving more than $1,000,000 from a financial institution, and organizing or leading an extensive criminal activity. The district court overruled his objections.

As Lugo preserved his claims, we review the district court's factual findings supporting these enhancements for clear error.

### a. sophisticated means

As to using sophisticated means, Lugo used several Union Accounts (the Infrastructure Account, the Administrative Account, and the Welfare Account) to conceal and move millions of dollars. The record also shows that Lugo filed fraudulent tax returns and that he participated in doctoring minutes of meetings. These are sufficient "sophisticated means" to support the enhancement. See United States v. Edelmann, 458 F.3d 791, 816 (8th Cir. 2006) (affirming where the defendant "created and used numerous false documents," "including multiple years of federal tax returns," fake loan documents, and misleading bank statements; even assuming the component parts of the scheme were not complex, "the total scheme was sophisticated"). The only things that Lugo raises in response are the same claims that support his sufficiency claims, which we have already rejected.

### b. $1,000,000 in gross receipts from a "financial institution[]"

As to "deriving more than $1,000,000 from a financial institution," Lugo argues that the Plan does not qualify as a "financial institution." However, U.S.S.G. § 2B1.1 cmt. n.1 defines a "financial institution" as the following:

> "Financial institution" includes any . . . union or employee pension fund; any health, medical, or hospital insurance association; . . . and any similar entity, whether or not insured by the federal government. "Union or employee pension fund" and "any health, medical, or hospital insurance association," primarily include large pension funds that serve many persons . . . and associations that undertake to provide pension, disability, or other benefits (e.g., medical or hospitalization insurance) to large numbers of persons.

The Health Plan clearly falls within this definition. We thus reject Lugo's claim.

### c. "organizer or leader"

As to his "organizer or leader" enhancement under U.S.S.G. § 3B1.1(a), Lugo argues that the district court clearly erred in imposing the enhancement because, he claims, there was no evidence that Lugo managed participants. See United States v. Cali, 87 F.3d 571, 578 (1st Cir. 1996) (noting that, "[i]n the past, we have required some 'degree of control or organizational authority over others' to support a section 3B1.1(b) adjustment"). Lugo, in particular, argues that the district court clearly erred when it found at sentencing that Lugo "recruit[ed]" the other Defendants to participate in the scheme, as all of the Defendants were elected to their positions. But such a finding is not clearly erroneous given that the evidence showed his extensive coordination of the various activities engaged in by the Defendants, such as falsifying loan documents, doctoring minutes, and bamboozling the

-88-

OIC concerning the administrative services contract.  Thus, his coordination supports a reasonable inference that he recruited the others to participate.  In any event, his involvement in all of these activities supports the district court's ultimate finding that "[f]rankly, this [crime] would not have happened [but] for the fact that [Lugo] was there."  Finally, Lugo seizes on the district court's statement that "[t]here is no leader here," but the district court made this statement in response to defense counsel's statement that the Defendants "were elected by the leadership." (Emphasis added).  Read in context, the statement only corrects defense counsel's statement.  Accordingly, the district court did not err in imposing the enhancement.

### 3.  **Substantive Reasonableness**

Finally, Lugo and Román challenge the substantive reasonableness of their sentences under 18 U.S.C. § 3553(a), citing their old age and poor health.  Lugo separately challenges the disparity between his sentence and that of Román.  Lugo was sentenced to 210 months and Román to 108 months.

We review a substantive reasonableness challenge under an "abuse-of-discretion standard." Gall v. United States, 128 S. Ct. 586, 594 (2007).  Specifically, we review a within Guidelines sentence only for whether it represents "a defensible overall result." United States v. Jiménez-Beltre, 440 F.3d 514, 518 (1st Cir. 2006) (en banc).

We conclude that the result here was defensible. Román claims that nine years "is a very long time" for someone with his health conditions, but fails to show that he cannot get adequate medical care in prison. Neither does Lugo, who makes the same argument. Given the severity and sophistication of their offenses, their sentences are appropriate despite their ages. Lugo separately emphasizes the disparity between his sentence (210 months) and Román's sentence (108), arguing that their sentences must be "aligned" because the "disparit[y] [is] conspicuous and threaten[s] to undermine confidence in the criminal justice system." United States v. Martin, 520 F.3d 87, 94 (1st Cir. 2008). However, we leave such alignment to the discretion of the district court, see id., and the district court did not abuse its discretion here, where Lugo's longer sentence is justified by, among other things, the fact that he embezzled double the amount of funds as did Román. For all of these reasons, we reject their claims.

### III.  Conclusion

For the forgoing reasons, we affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

**Affirmed in part, Reversed in part, and Remanded**.